Robert D. MARTINEZ, Jr., Plaintiff,

v.

**BOHLS BEARING EQUIPMENT CO. and Bohls Bearing Service Co., Defendants.**

No. Civ.A.SA–04–CA–0120–XR.

United States District Court,
W.D. Texas
San Antonio Division.

Feb. 28, 2005.

As amended April 11, 2005.

Robert D. Martinez, Jr., San Antonio, TX, pro se.

Malinda A. Gaul, San Antonio, TX, pro se.

Mark Anthony Sanchez, Beverly West Stephens, Gale, Wilson & Sanchez, P.L.L.C., San Antonio, TX, for Plaintiff.

Frederick Richard Zlotucha, Law Office of Frederick R. Zlotucha, San Antonio, TX, for Defendants.

## ORDER

RODRIGUEZ, District Judge.

Plaintiff's motion to amend the Court's February 28, 2005, summary judgment Order granting in part and denying in part summary judgment is GRANTED (docket no. 54). That Order is amended as follows to certify it for interlocutory appeal.

Before the Court is Defendants' Motion for Summary Judgment (docket no. 33). Plaintiff has filed claims for various causes of action, including violations of the Thirteenth Amendment, 42 U.S.C. § 1981, Title VII, the Fair Labor Standards Act

("FLSA"), and intentional infliction of emotional distress. Defendants have moved for summary judgment arguing that the incorrect defendant was named as a party, that no adverse employment action was taken against Plaintiff, that the FLSA claim is subject to an accord and satisfaction, and that the evidence does not create a genuine issue of material fact as to any claim. The Court GRANTS in part and DENIES in part Defendants' motion. Summary judgment is granted in favor of Defendants on Plaintiff's Thirteenth Amendment, § 1981, and Title VII discrimination and retaliation claims, as well as Plaintiff's intentional infliction of emotional distress claim under Texas law. Genuine issues of material fact remain as to Plaintiff's Title VII harassment and FLSA retaliation claims.

## I. Factual and Procedural Background

Plaintiff is a Hispanic male who was employed by Defendants from April 1996 to July 7, 2003 as a warehouseman and driver. According to testimony by Plaintiff and other employees, Defendants' president, Louis Bohls, made numerous and ongoing racial slurs directed at his Hispanic workers. These slurs included phrases such as: "Do it like a white man, not like a Mexican;" "Do your work like a white man would, not like a dumb Mexican;" "You dumb Mexican, do it right like a white man;" and "The only things Mexicans are good for are having babies and getting welfare, and that comes out of my pocket." Plaintiff asserts that these comments were made on a continuous, near-daily basis. Plaintiff states that he complained of this treatment, but to no avail.

According to the affidavit of Allen Shuler, Defendants' computer analyst and apparent controller, Plaintiff began his employment on April 7, 1997 at a rate of $5.50

per hour. Beginning in December of 2001, Plaintiff was scheduled to work every other Saturday for five hours, with an agreed payment of $50 per Saturday worked. Shuler states that after a number of raises, Plaintiff's wage as of August 9, 2002 was $8.13 per hour, plus the $50 for each Saturday worked. In May 2002, Plaintiff informed the company vice-president that he had not been paid for his Saturday work. The company vice-president informed Shuler to increase Plaintiff's pay by an additional $45 to cover Saturday work. Shuler, thinking that Plaintiff's pay would now be incorrect, informed Mr. Bohls that Plaintiff was then to receive $95 for Saturday work. Mr. Bohls informed Shuler that the additional $45 should not be paid. No records have been put forward to verify Plaintiff's wages and none were put forward to support Shuler's affidavit. In June 2003 Defendants eliminated all Saturday work for driver/warehouse employees.

At some point prior to June 2003, Plaintiff went to the Department of Labor[1] and complained about not receiving overtime pay for Saturday work. Shortly after this, Mr. Bohls received a phone call from an individual at the Texas Workforce Commission ("TWC") regarding a complaint filed either by Plaintiff or Plaintiff's son as to the failure to pay overtime. During this conversation with the TWC, Mr. Bohls was apparently informed that the company was not in compliance with the law. Mr. Bohls asked for information as to how he should structure salaries and overtime payments in order to be in compliance with the law. According to Mr. Bohls, the TWC informed him of the law and also informed him that he could informally settle the overtime claim with Plaintiff by paying him and obtaining a release. After this conversation, Mr. Bohls apparently insti-

---

**1.** No documentation is provided to support this. According to Plaintiff, he was told by the Department of Labor that he did not have a valid claim.

tuted a change in the payroll system and all employees were informed on June 2, 2003 that they were to receive a pay stub each pay period and that all work would be from 8:00 a.m. to 5:00 p.m., Monday thru Friday, with no work on Saturdays.

On June 2, 2003 Plaintiff was called into a meeting with Mr. Bohls. During this meeting Mr. Bohls offered Plaintiff $1000 to compensate him for Saturday work that Plaintiff maintained he had not been paid for. Plaintiff signed a notarized memorandum that stated "I Robert D. Martinez on this 2nd day of June 2003, accept $1000.00 in full payment for all overtime accumulated and unpaid during the period from 06/01/01 to 06/01/03. I consider this amount as full settlement for all overtime in question and reported." Plaintiff states that he signed this memorandum and took $1000, even though he believed he was owed nearly $3500, because he needed money to fix his vehicle and because his wife was sick.[2] Sometime after the June 2, 2003 meeting, Plaintiff received his next paycheck. According to Plaintiff, at some point prior to this he had been told by the company vice-president and by Shuler that his salary was to be $9.00 per hour. In the paycheck following the June 2, 2003 meeting, however, Plaintiff found that his salary was listed as $8.13 per hour.

On June 20, 2003 Plaintiff filed a Wage Claim with the TWC. In this Wage Claim, Plaintiff complained that he had not been fully paid overtime benefits and that his salary had been reduced from $9.00 per hour to $8.13 per hour because he had filed a complaint with the Department of Labor. On July 2, 2003 Plaintiff received notice from the TWC that his Wage Claim had been received by the Labor Law Department of the TWC and that Defendants had been notified of the claim. On July 7, 2003 Plaintiff was called into Mr. Bohls's office where he met with Mr. Bohls and Irma Booher, a collections and accounts receivable clerk.[3] At this meeting Plaintiff was asked to explain his position as to his salary. Plaintiff told Mr. Bohls that he thought his salary was $9.00 per hour and that he expected to be paid that amount. Plaintiff also told Mr. Bohls that he would accept $1500 to finally settle the overtime claim. Mr. Bohls told Plaintiff that the company did have any "$9 jobs." At this point Plaintiff apparently asked when he could pick up his final check. Plaintiff asserts that he was fired at this meeting. Defendants assert that Plaintiff quit because his salary demands would not be met. Booher testified that her feeling was that Mr. Bohls "terminated" Plaintiff at this meeting.[4]

On August 25, 2003, a Preliminary Wage Determination Order was entered by the TWC denying Plaintiff's Wage Claim. After Plaintiff appealed the order, the TWC denied the Wage Claim on November 6, 2003. The TWC found that the June 2, 2003 release memorandum and the $1000

---

2. During much of 2002 and 2003, Plaintiff's wife was terminally ill with cancer. Throughout this period, Plaintiff received loans from Defendants to help defray costs associated with his wife's care. These loans were all repaid through deductions from Plaintiff's salary. Plaintiff also was given use of a company car in May and June 2003 when his truck broke down.

3. According to Booher, she was called into the meeting to keep Mr. Bohls from saying anything "rude" or "mean."

4. Plaintiff filed for unemployment benefits after leaving his employment with Defendants. Plaintiff was initially ruled to have quit his employment, however this ruling was reversed on August 29, 2003 by the TWC Appeals Tribunal. The Appeals Tribunal found that Plaintiff had been terminated for complaining that he was being paid at a rate of $8.13 per hour, rather than a promised $9.00.

payment settled the issue of overtime payments. The TWC did not address Plaintiff's complaint that his salary had been reduced.[5] No appeal was taken of this ruling.

Plaintiff filed a Charge of Discrimination with the EEOC on July 18, 2003. Plaintiff complained that he had been harassed and discriminated against on the basis of his race and national origin and that he had been retaliated against for complaining about discrimination. Plaintiff was issued a right to sue letter on December 5, 2003 and filed his federal Complaint on February 6, 2004. In Plaintiff's Amended Complaint, Plaintiff alleges violations of the Thirteenth Amendment, § 1981, Title VII, the FLSA, and intentional infliction of emotional distress under Texas law. Defendant has now moved for summary judgment.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of showing that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law. *Willis v. Roche Biomedical Lab., Inc.*, 61 F.3d 313, 315 (5th Cir.1995). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir.1991). All justifiable

inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, the court will review the evidence in the record and disregard the evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 4, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the record, viewed in this light, could not lead a rational trier of fact to find for the party opposing the motion, summary judgment is proper.

## III. Analysis

Plaintiff puts forward a number of causes of action. These include causes of action based upon the Thirteenth Amendment, § 1981, Title VII, the FLSA, and the Texas tort of intentional infliction of emotional distress. Certain of these causes of action can be summarily eliminated. Others, however, are supported by the evidence and may proceed to trial.[6]

---

5. The TWC noted in its ruling that Plaintiff's salary was $8.13 per hour through June 2003.

6. Defendant objects to and moves to strike certain affidavits and declarations attached to Plaintiff's Response as not meeting the requirements of FED. R. CIV. P. 56(e) and the Federal Rules of Evidence. Defendant generally objects to the affidavits and declarations of Plaintiff, Aurora Adams, and Gilbert Martinez as containing hearsay and irrelevant material. The Court has disregarded all information that is inadmissible under the Rules in the consideration of this motion. Defendants' motion to strike is DENIED.

## A. Thirteenth Amendment Claim

 Plaintiff's Amended Complaint states that Defendant "intentionally deprived him of the rights and privileges guaranteed to [Plaintiff] by the Thirteenth Amendment to the United States Constitution by terminating him based upon his race and national origin, Mexican–American, and retaliating against him because he engaged in protected conduct and opposed conduct made unlawful by federal law." This claim is nothing more than employment discrimination and retaliation claims disguised under the rubric of the Thirteenth Amendment.[7] It has nothing to do with the evils the Thirteenth Amendment was meant to remedy. "[T]he phrase 'involuntary servitude' [under the Thirteenth Amendment] was intended to 'cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.'" *U.S. v. Kozminski*, 487 U.S. 931, 942, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) (quoting *Butler v. Perry*, 240 U.S. 328, 332, 36 S.Ct. 258, 60 L.Ed. 672 (1916)). The Thirteenth Amendment does not create a cause of action for employment discrimination. *See Mitchell v. Carrier Corp.*, 954 F.Supp. 1568, 1575 (M.D.Ga.1995). Accordingly, summary judgment is granted in favor of Defendants on Plaintiff's Thirteenth Amendment claim.

## B. Discrimination and Harassment Claims

Title VII makes it "an unlawful employment practice for an employer ... to discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] national origin...." 42 U.S.C. § 2000e–2(a)(1). The standard of proof for Title VII discrimination claims also applies to § 1981 claims. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n. 2 (5th Cir.1999). Because the same facts underlie Plaintiff's causes of action for discrimination and harassment under both § 1981 and Title VII, the analyses can be combined. *See Roberson v. Alltel Info. Services*, 373 F.3d 647, 651 (5th Cir. 2004).

### 1. Discrimination Claims

In order to establish a valid claim for discrimination, a plaintiff must meet a tri-partite analysis. *McDonnell Douglas v. Green*, 411 U.S. 792, 802—04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *McDonnell's* tri-partite analysis applies to employment discrimination claims under § 1981 as well. *Roberson*, 373 F.3d at 651. Plaintiff must first establish a prima facie case of discrimination. If this is established, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for their actions. If Defendants satisfy this requirement, the burden shifts again to Plaintiff to prove that the reasons offered by Defendants were not true, but were a pretext to discrimination. *Id.* Plaintiff can establish pretext either directly, by showing a discriminatory reason motivated management, or indirectly, by showing that the reasons given by management are simply not believable. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

 The burden of establishing a prima facie case of discrimination is not overly difficult. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. To establish the prima facie case, a plaintiff must show (1) he was a member of a protected class; (2) he was qualified for his position; (3) an adverse

---

7. The Thirteenth Amendment states, "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. CONST. amend. XII, § 1.

employment action was suffered; and (4) other similarly situated employees were treated more favorably. *Bryan v. McKinsey & Co.*, 375 F.3d 358 (5th Cir.2004). Plaintiff has put forward no evidence of disparate treatment to meet a prima facie case of discrimination. There is no evidence that other similarly situated employees were treated more favorably than Plaintiff. Specifically, Plaintiff has put forward no evidence that any other employee was promised a certain salary prior to the change in payroll structure and that the promise was kept.[8] Consequently, there is no evidence of discrimination under either Title VII or § 1981.

### 2. Harassment Claim

Plaintiff argues in his Response to Defendants' Motion for Summary Judgment that his claim for racial harassment should go forward. While not well pleaded, Plaintiff's Amended Complaint is sufficient under the "notice pleading" standard to present a claim for racial harassment. Specifically, Plaintiff's Amended Complaint states that "Defendants' discriminatory animus created and perpetuated a racially hostile environment by permitting and tolerating persistent and widespread slurs and threats."[9] A valid cause of action exists for "hostile environment" racial harassment. *See Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir.1996).

To prevail under a claim for racial harassment based on a hostile work environment, a plaintiff must show that the conduct was so "severe or pervasive" as to create an environment that a reasonable person would find hostile or abusive. *Id.* To establish a prima facie case, a plaintiff must show (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendants knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine v. Petroleos de Venezuella S.A.*, 266 F.3d 343, 353 (5th Cir. 2001). "[T]he phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.... One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers...." *Rogers v. EEOC*, 454 F.2d 234 238 (5th Cir.1971); *see also Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Vinson*, 477 U.S. at 66, 67, 106 S.Ct. 2399).

The summary judgment evidence supports Plaintiff's prima facie case of harassment. The evidence shows that Plaintiff is of Mexican origin and, according to multiple sources, was subjected to racial slurs and epithets on a continual,

8. Plaintiff made no effort to argue that a discrimination claim could survive summary judgment in response to Defendants' motion for summary judgment.

9. This allegation is set forth under the heading "Count Three: Violations of Title VII of the Civil Rights Act of 1964." It is not set forth under the separate heading "Count Two: Violations of 42 U.S.C. § 1981." The Court reads Plaintiff's Amended Complaint as alleging a Title VII racial harassment claim based on a hostile work environment.

near-daily basis. Despite Defendants' insistence that Mr. Bohls never made these comments, all inferences must be made in favor of the non-movant. Plaintiff has presented sufficient summary judgment evidence that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive" so as to alter the conditions of his employment and create an abusive working environment. *Id.* Plaintiff's summary judgment evidence of repeated racial slurs and epithets by the president of the company, directed at most, if not all, of the employees of Mexican origin, suggests that Defendants' workplace was "so heavily polluted with discrimination" as to create a hostile work environment towards those employees. Finally, Plaintiff need not show that Defendants knew of or should have known of the harassment in question and failed to take remedial action. Where the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the victim, the plaintiff need only satisfy the first four elements to establish a harassment claim. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Celestine,* 266 F.3d at 353—54. The alleged perpetrator of the harassment in this case was the president of the company. Multiple employees of the company have given affidavits and deposition testimony as to the language used by Mr. Bohls. Plaintiff's summary judgment evidence is sufficient to make out a prima facie case of racial harassment based upon a hostile work environment under Title VII. Summary judgment is therefore denied as to this claim.

## C. Retaliation Claims

Plaintiff argues that he was retaliated against for complaining about a hostile work environment, for complaining about overtime benefits to the Department of Labor, and for filing a state Wage Claim raising the issues of a reduction in pay and a failure to properly compensate for overtime work.

### 1. Title VII & § 1981 Retaliation

■ The framework for analyzing a retaliation claim under Title VII and § 1981 is the same as that used in the employment discrimination context. *See Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir.1998). To establish a prima facie case for retaliation under Title VII and § 1981, a plaintiff must show that (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action; and (3) a causal connection existed between the participation in the protected activity and the adverse employment action. *Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 655 (5th Cir.2004). In order to defeat summary judgment, a plaintiff must offer evidence from which the jury may infer that retaliation, in whole or in part, motivated the adverse employment action. *See Evans v. City of Houston,* 246 F.3d 344, 355 (5th Cir.2001).

Plaintiff confuses retaliation claims under Title VII and under the FLSA. A retaliation claim under Title VII requires that a plaintiff engage in activity protected by Title VII. Plaintiff's response points only to his action with regard to his overtime claim, e.g. "that Plaintiff complained to the DOL and thereafter filed a Wage Claim with the TWC," as protected activity. This activity is protected under the FLSA, not Title VII.

■ Plaintiff does state in his affidavit that he complained, to no avail, of racial harassment perpetrated by Mr. Bohls. There is no evidence that an adverse employment action was taken in retaliation of this activity. Plaintiff states that harassment was ongoing throughout his employment. Plaintiff received numerous pay raises throughout his employment, howev-

er. There is no evidence that Plaintiff's pay was ever decreased prior to June 2003, after apparent contact was made with the Department of Labor regarding overtime benefits. Plaintiff has offered no evidence that he was retaliated against because of activity protected under Title VII. Plaintiff, therefore, has no claim for retaliation under Title VII or § 1981.

### 2. Retaliation under the FLSA

█ The FLSA provides, in part, that it is unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding...." 29 U.S.C. § 215(a)(3). An informal complaint regarding violations of the FLSA can meet the "complaint" requirement of § 215(a)(3). *See Dearmon v. Texas Migrant Council, Inc.*, 252 F.Supp.2d 367, 367—68 (S.D.Tex.2003) (collecting cases). Retaliation claims under the FLSA, like those under Title VII, are subject to the *McDonnell Douglas* framework. *Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 577 (5th Cir.2004). To establish a prima facie case of retaliation under the FLSA, a plaintiff must show that (1) he engaged in a protected activity under the FLSA; (2) he was subjected to an adverse employment action; and (3) there was a causal connection between the activity and the adverse action. *James v. MedicalControl, Inc.*, 29 F.Supp.2d 749, 752 (N.D.Tex.1998); *see also id.* (citing *Goldberg v. Bama Mfg. Corp.*, 302 F.2d 152, 154 (5th Cir.1962)) (noting that the FLSA only protects employees asserting their statutory rights). If Plaintiff successfully establishes a prima facie case, Defendants must then rebut the presumption of retaliation by articulating a legitimate, non-retaliatory reason for its decision to terminate the plaintiff. If this requirement is met, Plaintiff must then produce evidence that the proffered reason for discharge is merely a pretext, and that the real reason for his termination is an illegal retaliatory animus. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Plaintiff has presented evidence sufficient to establish a prima facie case of retaliation under the FLSA. Plaintiff engaged in protected conduct under the FLSA, making an informal complaint to the Department of Labor and then filing a Wage Claim with the TWC on June 20, 2003 as to alleged unpaid overtime benefits and an alleged reduction in salary. On July 7, 2003, Plaintiff was called into a meeting with Mr. Bohls and Irma Booher, apparently to discuss his claims. At this meeting, Plaintiff's stance that his salary was promised to be $9.00 per hour, rather than $8.13, was apparently discussed and rejected by Mr. Bohls, as was Plaintiff's request for $1500 in overtime benefits. Following this meeting, Plaintiff was no longer employed. Plaintiff claims that his salary was reduced from $9.00 per hour to $8.13 per hour in retaliation for making an informal complaint to the Department of Labor, and that he was fired at the July 7 meeting in retaliation for filing the Wage Claim. Either of these claims, if true, would constitute an adverse employment action. *See Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997). Defendants claim that Plaintiff never made and was never promised $9.00 per hour, and that Plaintiff quit at the meeting. Defendants claim, therefore, that Plaintiff has no evidence of an adverse employment action.

█ There is no conclusive evidence that establishes whether an adverse employment action was taken. As to the alleged reduction in salary, it appears that

no pay stubs were provided to employees prior to filing of Plaintiff's Wage Claim. No evidence other than the statements of Shuler and Plaintiff were offered to show at what rate Plaintiff was to be paid in June of 2003. Therefore, it is impossible at this stage to definitively say at what wage Plaintiff was paid prior to the filing of his Wage Claim.[10] As all inferences must be taken in favor of the non-movant, the Court finds that a reasonable trier of fact could find that Plaintiff's hourly rate was reduced in retaliation to Plaintiff's protected activity. In addition, the Court finds that a reasonable trier of fact could find that Plaintiff was fired at the July 7 meeting[11] and that Plaintiff's termination was in retaliation for the filing of the Wage Claim on June 20. Accordingly, the Court finds that Plaintiff has met his requirement to set forth a prima facie case of retaliation under the FLSA.

Defendants extend most of their efforts in the attempt to establish that Plaintiff has not met his prima facie case. Defendants state that should a prima facie case be found, a non-discriminatory reason for its action has been put forward by providing evidence as set forth in the Exhibits attached to the motion for summary judgment. Defendants do not address any non-retaliatory reasons for its actions, other than that their actions were non-retaliatory. After wading through Defendants' Exhibits, it appears that Defendants' non-retaliatory reason to rebut Plaintiff's retaliation claim under the FLSA is that Plaintiff's salary was $8.13 per hour, rather than $9.00 per hour, and that Plaintiff was terminated for requesting a raise. A reasonable trier of fact could find that this action was done in response to Plaintiff's protected activity, and that any non-retal-

iatory reason put forward by Defendants would be a pretext for retaliatory animus. The Court finds, therefore, that Plaintiff has met his summary judgment burden of establishing a claim for retaliation under the FLSA.

## D. Overtime Benefits

The most difficult question to be answered by Defendants' motion for summary judgment is whether Plaintiff is entitled to bring a cause of action for violations of the FLSA despite the existence of a compromise settlement which by its terms purports to release Plaintiff's FLSA claim for overtime benefits. Certain Circuit Courts of Appeals have read the FLSA, and its purposes, broadly so as to imply and/or hold that all private settlements of claims under the FLSA are unenforceable. In order to determine whether purely private compromises of claims under the FLSA involving bona fide disputes as to liability are prohibited or permitted, it necessary to conduct a thorough examination of the FLSA, its amendment by the Portal–to–Portal Act of 1947 and the Fair Labor Standards Amendments of 1949, and subsequent interpretive case law.

### 1. Fair Labor Standards Act

The FLSA was enacted in 1938 "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). "[T]he FLSA was

---

10. The TWC found that Plaintiff was, at some point prior to July 7, 2003, promised a wage of $9.00 per hour by the company vice-president.

11. Irma Booher testified in her deposition that she believed Mr. Bohls terminated Plaintiff at the July 7 meeting.

designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive a fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay." *Id.* (quotations and citations omitted). Under the FLSA, "[e]very employer shall pay to each of his employees ... wages at the following rates: ... (1) ... not less than $5.15 an hour." 29 U.S.C. § 206(a)(1). Likewise, "no employer shall employ any of his employees ... [for a workweek longer than forty hours] ... unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." *Id.* § 207(a)(2). An aggrieved employee may bring his statutory wage and hour claim "in any Federal or State court of competent jurisdiction." *Id.* § 216(b). Under § 216(b), "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages," as well as attorney's fees and costs. *Id.* In its initial form, the FLSA allowed only the aggrieved employee, or a collection of similarly situated employees, to bring suit for collection of unpaid wages or overtime compensation. Fair Labor Standards Act, c. 676, § 16, 52 Stat. 1069 (1938). Nothing was mentioned as to the ability of parties to enter into private settlements.[12]

Prior to 1945, the majority of court decisions had determined that employers and employees could not reach private settlements as to unpaid wages or overtime compensation so as to waive the liquidated damages claim under the Act. *See, e.g., Fleming v. Post,* 146 F.2d 441 (2d Cir. 1944); *Seneca Coal & Coke Co. v. Lofton,* 136 F.2d 359 (10th Cir.1943). The ability to settle claims in cases involving bona fide disputes was less certain, however. *Compare Atlantic Co. v. Broughton,* 146 F.2d 480 (5th Cir.1944) ("If ... the payments in settlement were made under such circumstances as would create an agreement of accord and satisfaction, the claim for liquidated damages upon the amounts given in settlement was extinguished. If not, such claims continue to be valid obligations enforceable...."); *Id.* at 485 (Waller, J., dissenting) ("I especially cannot concur in any construction of the Act which outlaws the amicable settlement of actual controversies relating to the number of hours worked for which wages are claimed, for ... the number of hours in which any employee may have worked during a period in question is wholly a question of fact concerning which frequently arise honest and difficult disputes."); *with Fleming,* 146 F.2d at 443 (holding that a release was not valid even where there would typically be an accord and satisfaction); *Guess v. Montague,* 140 F.2d 500, 505 (4th Cir.1943) (same). In two Supreme Court cases, the ability of parties to settle their claims without litigation was determined to some degree.

---

**12.** The original bills introduced into the House and Senate included a section which stated "[a]ny contract, agreement, understanding, condition, stipulation, or provision binding any person to waive compliance with any provision of this Act or with any regulation or order thereunder shall be null and void." S. 2475, § 20(b), 75th Cong., 1st Sess., introduced May 24, 1937; H.R. 7200, § 20(b), 75th Cong., 1st Sess., introduced May 24, 1937; *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 711 n. 28, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). This section was eliminated by the Conference Committee without comment. *O'Neil,* 324 U.S. at 711 n. 28, 65 S.Ct. 895.

## 2. O'Neil & Gangi

In 1945, the Supreme Court took up the question as to whether FLSA claims for liquidated damages could be privately settled where there was no dispute as to coverage or liability. In three consolidated cases, the Court took pains to illustrate that its decision did not involve a bona fide dispute as to coverage or amount due. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). In two of the cases there was no dispute as to the amount of compensation that had been withheld and that was due.[13] In the third case, the employer had withheld certain basic statutory wages until after another Supreme Court case had established that the employer was covered under the FLSA. The Court found that "the record in [the] case showe[d] that the release was not given in settlement of a bona fide dispute between employer and employee." *Id.* at 703, 65 S.Ct. 895. "The issue presented [in the third case] therefore [was] whether *in the absence of a bona fide dispute between the parties as to liability*, [the employee's] written waiver of his right to liquidated damages under Section 16(b) bar[ed] a subsequent action to recover liquidated damages." *Id.* at 704, 65 S.Ct. 895 (emphasis added). The Court ruled that a claim for liquidated damages could not be waived through a release in this situation. This was determined by examining the public policy supporting the FLSA.

The legislative history of the [FLSA] shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours.... The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency....

*Id.* at 706, 65 S.Ct. 895 (citations omitted). "[T]he same policy which forbids employee waiver of the minimum statutory rate because of inequality of bargaining power, prohibits these same employees from bargaining with their employer in determining whether so little damage was suffered that waiver of liquidated damage is called for." *Id.* at 708, 65 S.Ct. 895. Waivers of claims for liquidated damages, such as were signed in each of the three consolidated cases, were thus held unenforceable and void as contrary to public policy. *Id.* at 710, 65 S.Ct. 895. After making this determination, the Court made clear that its ruling did not necessarily apply to cases involving bona fide disputes as to liability. *Id.* at 714, 65 S.Ct. 895 ("Our decision ... has not necessitated a determination of what limitation, if any, [§ 216(b)] places on the validity of agreements between an employer and employee to settle claims arising under the [FLSA] if the settlement

---

13. In the first case, the employer determined that the employee had not been paid statutory overtime compensation over a two-year period. Two years after the employee had left his employment, the employer offered a check representing the overtime compensation due and had the employee sign a release of all of his rights under the FLSA. The employee subsequently sued for liquidated damages. In the second case, the Wage and Hour Administration determined that the employer had failed to pay overtime compensation and obtained an injunction. The employer offered

the employee a check for $500 and had the employee sign a general release of all claims under the FLSA. Both parties knew that more than $500 was due. After obtaining the check and signing the release, the employee engaged counsel. Before suit was filed, the employer tendered the balance of the statutory wages due, but this was refused by the employee. The employee filed suit for the balance due and for liquidated damages. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 702—03, 65 S.Ct. 895, 89 L.Ed. 1296 (1945).

is made as the result of a bona fide dispute between the parties; in consideration of a bona fide compromise and settlement.").

In a separate concurring and dissenting opinion, Chief Justice Stone, joined by Justices Roberts and Frankfurter, stated that he would have held the right to liquidated damages was a private claim that could be released. As observed by the Chief Justice,

The studious avoidance of any provision making the non-payment of the liquidated damages a public wrong, by the omissions of sanctions which the statute does impose for the failure to pay minimum and overtime wages, is the most persuasive kind of evidence that it was the Congressional purpose to leave undisturbed the general policy of the law that a mere private claim for damages may be released at the will of the claimant.

*Id.* at 717, 65 S.Ct. 895 (Stone, C.J., concurring in part and dissenting in part). The Chief Justice did acknowledge that the release of minimum and overtime wages was likely against the congressional intent of the FLSA. *Id.* This was because a release of minimum or overtime wages could be viewed as a public wrong, while release of liquidated damages could be viewed as strictly a private concern. *Id.* at 718, 65 S.Ct. 895.

One of the questions left open by *O'Neil* was answered by the Supreme Court the next Term in *D.A. Schulte, Inc. v. Gangi,* 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1946). In *Gangi*, the Court addressed the question of whether a release of liquidated

damages was valid where there was a bona fide dispute as to coverage under the FLSA. *Id.* at 109, 66 S.Ct. 925. The employer in *Gangi* had failed to make payments for overtime compensation under the theory that it was not covered by the FLSA. Under the threat of suit by its employees, the employer paid the overtime compensation in full and obtained a release from the employees as to their rights under the FLSA. *Id.* at 111—12, 66 S.Ct. 925. The Court found that "the remedy of liquidated damages cannot be bargained away by bona fide settlements of disputes over coverage." *Id.* at 114, 66 S.Ct. 925. This decision was based upon the policy of the FLSA as found in *O'Neil.* *Id.* at 116, 66 S.Ct. 925. This policy, "to secure for the lowest paid segment of the nation's workers a subsistence wage," could not support a compromise that reduced the sum selected by Congress, the amount of unpaid wages and/or overtime compensation due, plus an equal amount of liquidated damages, as a remedy for violations of the FLSA. *Id.* ("[N]either wages nor the damages for withholding them are capable of reduction by compromise of controversies over coverage.").[14] Therefore the employee's case was allowed to go forward for a claim of liquidated damages. As in *O'Neil*, the Court again made clear that it was not deciding the issue of private settlements involving bona fide disputes as to liability. *Id.* at 114, 66 S.Ct. 925 ("Nor do we need to consider here the possibility of compromises in other situations which may arise, such as a dispute over the number of hours worked or the regular rate of employment.").[15]

**14.** The Court cited to certain commentary regarding compromises of liability under the FLSA. *D.A. Schulte, Inc. v. Gangi,* 328 U.S. 108, 116 n. 13, 66 S.Ct. 925, 90 L.Ed. 1114 (1946). One of these commentators stated, "Accord and satisfaction may be valid consideration for a release where the dispute is as to the amount due, but not where the dispute exists as to the legal interpretation of the Act

as to coverage." L.B.E., *Recent Cases,* 14 Geo. Wash. L.Rev. 377, 387 (1946).

**15.** The Court cited to *Strand v. Garden Valley Tel. Co.,* 51 F.Supp. 898, 905 (D.Minn.1943). In *Strand*, the district court noted that, had it found a bona fide dispute as to the number of hours worked by the employee in question, it may have upheld a settlement and release

In dissent, Justice Frankfurter, joined by Justice Burton, stated that he would allow private settlements under the FLSA. As Justice Frankfurter stated,

Strict enforcement of the policy which puts beyond the pale of private arrangement minimum standards of wages and hours fixed by law does not .call for disregard of another policy, that of encouraging amicable settlement of honest differences between men dealing at arm's length with one another.

*Id.* at 122, 66 S.Ct. 925 (Frankfurter, J., dissenting). As in the Chief Justice's dissent in *O'Neil*, Justice Frankfurter noted that there was no indication that Congress would have banned private settlements involving bona fide disputes. *Id.* Justice Frankfurter placed upon Congress the onus for discouraging or outlawing private settlements: "To that end, some responsibility at least for a broad hint to the courts, if not for explicitness, should be left to Congress." *Id.*

Following the decisions in *O'Neil* and *Gangi*, an overwhelming amount of litigation was generated and employer cooperation with the FLSA's requirements was discouraged. *See* Amy Wax, *Waiver of Rights Under the Age Discrimination in Employment Act of 1967*, 86 COLUM. L.REV. 1067, 1075 n. 58 (1986) (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 155, 67 S.Ct. 639, 91 L.Ed. 809 (1947) (Jackson, J., concurring)). As was noted by Congress in 1949, one of the most

important reasons for the decline in voluntary restitution by employers was "the fact that an employer who pays back wages which he withheld in violation of the [FLSA] has no assurance that he will not be sued for an equivalent amount plus attorney's fees under the provisions of section 16(b) of the [FLSA]." Fair Labor Standards Amendments of 1949, S.Rep. No. 640, 81st Cong., *reprinted in* 1949 U.S.Code Cong. Serv. 2241, 2247. Justice Jackson put it succinctly in *Walling:*

Th[e] Court has foreclosed every means by which any claim, however dubious, under the [FLSA] or under the Court's elastic and somewhat unpredictable interpretation of it, can safely or finally be settled, except by litigation to final judgment.... No kind of agreement between the parties in interest settling borderline cases in a way satisfactory to themselves, however fairly arrived at, is today worth the paper it is written on. Interminable litigation, stimulated by a contingent reward to attorneys, is necessitated by the present state of the Court's decisions.

*Walling*, 330 U.S. 148, 155, 67 S.Ct. 639, 91 L.Ed. 809 (1947) (Jackson, J., concurring) (citing *O'Neil, Gangi, & Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers*, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945)).[16] Congress began to react to this increased litigation in 1947.

under the FLSA. *Id.* The *Strand* court stated that "[t]he facts with reference to such compromise or settlement must, however, be clear-cut and definite. There must be a final meeting of the minds upon the compromise, with a full understanding of the dispute and the effect of the compromise. The settlement must be as to the number of hours worked and thereafter must flow the full benefits as provided for by the [FLSA], based on such hours." *Id.* The citation to this particular section of *Strand* is strong support for the

inference that the *Gangi* Court may have supported private settlements in such a situation.

**16.** Justice Jackson had made these same views clear two years prior in *Jewell Ridge Coal Corp. v. Local No. 6167, UMW*, 325 U.S. 161, 195, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945) (Jackson, J., dissenting) (stating that it was "hard to see how the long-range interests of labor itself are advanced by a holding that there is no mode by which it may bind itself to any specified future conduct, however fairly bargained").

### 3. FLSA Amendments

The Portal–to–Portal Act of 1947 was the first response to what Congress viewed as "unexpected liabilities, immense in amount and retroactive in operation." 29 U.S.C. § 251. This legislation was prompted by "judicial [interpretation] in disregard of long-established customs, practices, and contracts between employers and employees." *Id.* It is generally viewed that the Portal–to–Portal Act was, in large part, passed in direct response to three Supreme Court cases [17] establishing employer liability for what was known as "portal-to-portal" activities, such as time spent walking on the employer's premises from the time clock to the work bench and time spent in other preliminary and postliminary activities. *See* Marc Linder, *Class Struggle at the Door: The Origins of the Portal–to–Portal Act of 1947*, 39 BUFF. L.REV. 53 (1991).

The Portal–to–Portal Act is also generally viewed as a direct response to the decisions in *O'Neil* and *Gangi. See U.S. v. Allegheny–Ludlum Indus., Inc.*, 517 F.2d 826, 862 (5th Cir.1975). Reaction to *O'Neil, Gangi,* and the portal cases was quick and vocal.[18] Section 3 of the Portal–to–Portal Act, codified at 29 U.S.C. § 253, includes language that could be viewed as permitting compromises of all FLSA claims involving bona fide disputes. 29 U.S.C. § 253(a) provides,

Any cause of action under the [FLSA] which accrued prior to May 14, 1947, or any action (whether instituted prior to or on or after May 14, 1947) to enforce such a cause of action, may hereafter be compromised in whole or in part, if there exists a bona fide dispute as to the amount payable by the employer to his employee; except that no such action or cause of action may be so compromised to the extent that such compromise is based on an hourly wage rate less than the minimum required under such Act, or on a payment for overtime at a rate less than one and one-half times such minimum hourly wage rate.

The language as to "any action ... to enforce such a cause of action" is ambiguous in that it could be read two different ways. It could be read to apply only to actions filed after May 14, 1947 that seek to "enforce" a cause of action under the FLSA that accrued prior to May 14, 1947, or it could be read to "enforce" any cause of action under the FLSA, whether filed before, on, or after May 14, 1947. As there exists an arguable ambiguity in the reading of the statute, an examination of the legislative history is permissible to draw out the true congressional intent. *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991).

In January 1947, 1,186 "portal suits" were filed in federal courts, as opposed to

---

**17.** *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944); *Jewell Ridge Coal Corp. v. Local No. 6167, UMW,* 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945); *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 683, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (collectively, "the portal cases").

**18.** For example, Representative Vorys stated that *Mt. Clemens* was "the most outrageous and unconscionable instance of judicial usurpation of the law-making power that I have ever seen." 93 CONG. REC. 1514 (1947). Sen-

ator Wherry stated that *Mt. Clemens* "pervert[ed] the [FLSA] from an instrument of righteous correction into an instrument to destroy those very employers who have attempted conscientiously to obey the mandates of the act." *Id.* at 2195. In addition, Raymond Smethurst, counsel for the National Association of Manufacturers, testified before the House Judiciary Committee in June 1945 regarding employers' concerns regarding the effect of the *O'Neil* and *Gangi* decisions. *See* Marc Linder, *Class Struggle at the Door: The Origins of Portal–to–Portal Act of 1947,* 39 BUFF. L.REV. 53, 127 (1991).

727 in the six months prior. Linder, 39 BUFF. L.REV. at 133. House Bill 584 was introduced on January 7, 1947. H.R. 584, 80th Cong., 1st Sess. (1947); 93 CONG. REC. 153—54 (1947). This bill contained a number of amendments to the FLSA meant to eliminate the effect of the Supreme Court's decisions. Linder, 39 BUFF. L.REV. at 136. As to the issue of private compromises of FLSA claims, H.R. 584 permitted all claims to be "waived, compromised, adjusted, settled, or released." *Id.* at 137. Following hearings before the House Judiciary Committee another bill, H.R. 2157, was prepared and reported to the House. 93 CONG. REC. 1489 (1947). H.R. 2157 made certain changes to H.R. 584, but did not change the section regarding compromises of FLSA claims. Linder, 39 BUFF. L.REV. at 140. The House Report stated this section "applie[d] to settlement both before and after the effective date of the act." H. Rep. No. 71, 80th Cong., 1st Sess., *reprinted in* 1947 U.S.Code Cong. Serv. 1029, 1036. H.R. 2157 passed the House on February 28, 1947.

The Senate initially considered a somewhat different bill. Senate Bill 70 was introduced in January 1947 by Senator Wiley, chair of the Senate Judiciary Committee. Linder, 39 BUFF. L.REV. at 144. As to the compromise of FLSA claims, S. 70 permitted employees to release employers from their liability for liquidated damages, but had no provisions for compromise of other claims. *Id.* An amendment was offered to S. 70 by Senator Capehart which would have permitted compromises of back wages. *Id.* at 144—45. While these bills were being debated, H.R. 2157 was committed to the Senate Judiciary Committee on March 3, 1947.[19] *Id.* at 147. The Senate version of H.R. 2157 was re-

ported by the committee with a number of changes. As to the compromise of FLSA claims, which was both prospective and retrospective under the House version, the Senate version distinguished between existing and future claims. *Id.* at 148. The Senate version did not permit the compromise or settlement of claims as to future actions in violation of the FLSA. *Id.* The Senate passed its version of H.R. 2157 on March 21, 1947.

The two versions of H.R. 2157 were referred to a conference committee on March 25, 1947 and the conference version of the bill was reported on April 29, 1947. Portal–to–Portal Act of 1947, H.R. Cong. Rep. No. 326, 80th Cong., 1st Sess. (1947). The conference version essentially adopted the Senate version of H.R. 2157 as to the compromise of FLSA claims. Linder, 39 BUFF. L.REV. at 156. Section 3 allowed the compromise of certain existing claims:

(a) Any cause of action under the [FLSA] ... which accrued prior to the date of the enactment of this Act, or any action (whether instituted prior to or on or after the date of the enactment of this Act) to enforce such a cause of action, may hereafter be compromised in whole or in part, if there exists a bona fide dispute as to the amount payable by the employer to his employee; except that no such action or cause of action may be so compromised to the extent that such compromise is based on an hourly wage rate less than the minimum required under such Act, or on a payment for overtime at a rate less than one and one-half times such minimum hourly wage rate.

(b) Any employee may hereafter waive his right under the [FLSA] to liquidated

---

**19.** Arguing in favor of passage of the House version of H.R. 2157, Senator Wherry stated that "the House bill is adequate.... Some people may think that the House bill goes too far in permitting settlements in [the] future of all types of claims arising under [the FLSA]. I do not think so, but in any event the Senate provision is too narrow." 93 CONG. REC. 2196.

damages, in whole or in part, with respect to activities engaged in prior to the date of the enactment of this Act. (c) Any such compromise or waiver, in the absence of fraud or duress, shall, according to the terms thereof, be a complete satisfaction of such cause of action and a complete bar to any action based on such cause of action.

Portal–to–Portal Act of 1947, H.R. Cong. Rep. No. 326, 80th Cong., 1st Sess. 4, § 3 (1947) (codified as 29 U.S.C. § 253 (enacted May 14, 1947)). The conference report shed some light on the treatment of future FLSA claims:

It will be noted that [section 3] of the conference agreement lays down no rule as to compromises or waivers with respect to causes of action hereafter accruing. The validity or invalidity of such compromises or waivers is to be determined under law other than this section.

*Id.* at 12.

The Portal–to–Portal Act thus attempted to grant some limited relief to employers by eliminating most of the existing portal claims and allowing for the compromise of nearly all then-existing FLSA claims. The legislative history demonstrates that Congress reacted to the decisions in *O'Neil*, *Gangi*, and *Mt. Clemens* with great animus. This suggests that a Congress relatively contemporary with the passage of the FLSA in 1938 viewed these decisions as contrary to the intent of the FLSA. Congress did not go so far as to completely disavow the holdings in *O'Neil* and *Gangi*, however, and left determination as to the possibility of compromising future FLSA claims to later consideration.

Following passage of the Portal–to–Portal Act, regulations were promulgated to implement the amendments to the FLSA. 29 C.F.R. § 790.27 dealt with compromises of claims existing prior to May 14, 1947. 12 Fed.Reg. 7655, 7668 (Nov. 18, 1947). The regulation noted that the Portal–to–

Portal Act "authorize[s] compromise only of those causes of action accruing prior to May 14, 1947, and of actions thereon; the statute does not change existing law as to compromise of such claims, with respect to any cause of action accruing after the date of enactment of the act." *Id.* (citations omitted). Section 790.27 sought to define a "bona fide dispute" as "an honest disagreement between employer and employee. It follows that no compromise would be permitted where there is no actual dispute as to the facts or the applicable law, or where the exact amount of an employer's liability under the law is clear." *Id.* at 7669. The regulation noted that *Gangi* had held that claims for minimum and overtime wages could not be compromised because of disputes as to coverage. *Id.* at 7668 n. 163. As in *Gangi* itself, there was no discussion as to the ability to compromise claims because of disputes as to liability, such as where the amount due was unclear.

Likely due to the confusing language in section 3 as to the ability to compromise claims accruing subsequent to May 14, 1947, the Portal–to–Portal Act apparently did little to facilitate voluntary restitution by employers. In fiscal year 1946, 74% of employees owed back wages or overtime compensation received restitution, whereas in 1948 only 56% of such employees received such restitution. Fair Labor Standards Amendments of 1949, S.Rep. No. 640, 81st Cong., 1st Sess., *reprinted in* 1949 U.S. Cong. Serv. 2241, 2249. Due in large part to figures such as these, Congress passed the Fair Labor Standards Amendments of 1949. Act of Oct. 26, 1949, c. 736, § 14, 63 Stat. 919 (1949). This act added section (c) to section 16 of the FLSA. Section 16(c) provides that the Secretary of Labor

is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to

any employee or employees under section 206 or section 207 of this title, and the agreement of any employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b) of this section to such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages.

29 U.S.C. § 216(c). As the Senate Report accompanying this legislation notes,

> One of the principal effects of [the act] will be to assure employers who pay back wages in full under the supervision of the Wage and Hour Division that they need not worry about the possibility of suits for liquidated damages and attorney's fees. Under [the act] an employee who is not paid minimum wages or overtime owing to him under the act may choose between action by the Administrator under the new subsection (c) for simply the amount which is owed to him and his own individual right of action under subsection (b) for both back wages and liquidated damages together with a reasonable attorney's fee.

Fair Labor Standards Amendments of 1949, S.Rep. No. 640, 81st Cong., 1st Sess., *reprinted in* 1949 U.S.C.C.A.N. 2241, 2249. Plaintiff thus argues that the language of this legislation, providing for settlement of FLSA claims through the Department of Labor, was the manner in which Congress spoke to the availability of compromises of actions accruing after May 14, 1947.[20] Plaintiff argues that Congress intended section 16(c) of the FLSA to be the exclusive manner by which to settle FLSA claims, even in situations involving bona fide disputes as to liability.

*4. Subsequent Judicial Interpretation*

Whether Congress intended section 16(c) to be the exclusive manner by which to settle claims does not have a clear answer. Implementation of the Portal–to–Portal Act and the Fair Labor Standards Amendments led certain Circuit Courts of Appeals to hold in conformance with Plaintiff's argument. Other courts, however, most notably the Fifth Circuit, chose to read these amendments rather broadly and left an opening to allow purely private settlements without approval from either the Department of Labor or the courts.

In *McCloskey & Co. v. Eckart*, 164 F.2d 257 (5th Cir.1947), the Court put forward a somewhat expansive reading of section 3 of the Portal–to–Portal Act. *McCloskey* held a private settlement, made prior to May 14, 1947, was enforceable under section 3:

> In section 3, compromises of rights and waivers of damages under the [FLSA] are dealt with and so far from nullifying them as contrary to the policy of the law, as was held by some courts, such compromises and waivers are, to the extent therein provided, approved and given effect by the policy-making organ of the Government, to-wit, the Congress. As to those made subsequent to the Act, section 3(c) provides: "Any such compromise or waiver, in the absence of fraud or duress, shall, according to the terms thereof, be a complete satisfaction of such cause of action and a complete bar to any action based on such cause of action."

*Id.* at 259. No mention was made in the Fifth Circuit's opinion as to the date restrictions regarding the applicability of section 3. While *McCloskey* can certainly not be read to give *carte blanche* to all compromises made subsequent to May 14,

---

**20.** Neither party has discussed the effect of the Portal–to–Portal Act upon the FLSA in this context, likely viewing that Act as an obscure relic of the past, as have many others. *See* Linder, 39 Buff. L.Rev. at 55.

1947, it is evident of the expansive reading that the Fifth Circuit would give to section 3 some thirty years later.[21]

In *U.S. v. Allegheny–Ludlum Indus., Inc.,* 517 F.2d 826 (5th Cir.1975), the Fifth Circuit put forward a most expansive reading of section 3. While technically dicta as to the availability of compromises of FLSA claims, the Court in *Allegheny–Ludlum* made clear its position that the Portal–to–Portal Act was meant to overrule *O'Neil* and *Gangi* and was meant to allow such compromises. After discussing the decisions in *O'Neil* and *Gangi,* the Court in *Allegheny–Ludlum* noted that those cases "once stood rather inflexibly for the idea that certain benefits under protective legislation would be sold for a song unless safeguarded by extraordinary measures." *Id.* at 861.

> Yet it remains that those cases were tied closely to the mandatory terms of particular statutes, the labor conditions that produced those statutes, and what the [Supreme Court] believed was a clearly discernible congressional intent. Since then, courts have declined in most instances to fashion comparable doctrine from whole cloth, the stronger reasoning being that the rubric of "unequal bargaining power" all too often tempts the judiciary to promulgate social values which, at best, intrude upon the legislative sphere, and at worst reflect imprecise apprehensions of economics and desirable public policy.

*Id.* (citing *Walling,* 330 U.S. 148, 155, 67 S.Ct. 639, 91 L.Ed. 809 (Jackson, J., concurring)). The Court then went on to partially quote section 3(a) of the Portal–to–Portal Act without any mention of the limiting language within the statute. *Id.* at 862. The Court also noted that, in its view, the Portal–to–Portal Act stood for the proposition that if the *O'Neil* and *Gan-*

gi cases were allowed to stand, "'the courts of the country would be burdened with excessive and needless litigation and champertous practices would be encouraged.'" *Id.* at 862 n. 42 (quoting 29 U.S.C. § 251(a)(7)). *Allegheny–Ludlum* thus stands for the proposition that in the Fifth Circuit *O'Neil* and *Gangi* likely have little to no lasting effect.

The waiver provision in section 16(c) of the FLSA was examined by the Fifth Circuit in *Sneed v. Sneed's Shipbuilding, Inc.,* 545 F.2d 537 (5th Cir.1977). The Court in *Sneed* noted that the addition of section 16(c) was intended to grant assurances to employers that voluntary settlement of claims supervised by the Wage and Hour Division would eliminate all other liability. *Id.* at 539. There was no discussion in *Sneed* of the language in *Allegheny–Ludlum,* nor was there a citation to the two-year old case or to § 253.

Unlike in the Fifth Circuit cases just discussed, cases in other Circuits have found the legislation amending the FLSA as establishing a mandatory process for compromising FLSA claims accruing after May 14, 1947. The only Circuit to rule squarely on this issue was the Eleventh Circuit in *Lynn's Food Stores, Inc. v. U.S.,* 679 F.2d 1350 (11th Cir.1982). In *Lynn's Food,* the Department of Labor concluded that the employer had violated the FLSA as to minimum wage, overtime, and record-keeping provisions. *Id.* at 1352. After the employer unsuccessfully attempted to negotiate a settlement with the Department of Labor, the employer approached the affected employees and offered $1,000 to be divided among them on a pro rata basis in exchange for a release of any other claim under the FLSA. *Id.* This offer was significantly less than the amount owed. *Id.* The Eleventh Circuit held that

---

**21.** *McCloskey* was recently cited with some approval by the Fifth Circuit in *Samson v.*

*Apollo Resources, Inc.,* 242 F.3d 629, 640 (5th Cir.2001).

"[t]here are only two ways in which back wage claims arising under the FLSA can be settled or compromised by employees:" payment supervised by the Secretary of Labor and judicial approval of a stipulated settlement after an employee has brought a private action. *Id.* at 1352—53. Private settlement of claims under the FLSA are not permissible under the Eleventh Circuit's reading. The Court stated that § 253 could not be used to authorize private settlements because it was applicable only to actions which accrued prior to May 14, 1947. *Id.* at 1353 n. 7. The strict reading of the FLSA was reasoned largely upon the facts in the case. According to the Court, the employees had not brought suit, were largely unaware of the fact that they had rights under the FLSA, had not consulted with an attorney before signing the agreements, and many did not speak English. *Id.* at 1354. As the Court stated, "many harms ... may occur when employers are allowed to 'bargain' with their employees over minimum wages and overtime compensation." *Id.* at 1355. Thus, the Court held that such "invidious practices" were prohibited. *Id.*

Similarly in *Walton v. United Consumers Club, Inc.*, 786 F.2d 303 (7th Cir. 1986), and *O'Connor v. U.S.*, 308 F.3d 1233 (Fed.Cir.2002), purely private settlements under the FLSA were thought to be prohibited. In *Walton*, the Seventh Circuit noted that "the [FLSA] is designed to prevent consenting adults from transaction about minimum wages and overtime pay. Once the [FLSA] makes it impossible to agree on the amount of pay, it is necessary to ban private settlements of disputes about pay." 786 F.2d at 306 (citing *Lynn's Food*, 679 F.2d at 1352). The Court viewed section 16(c) of the FLSA as the necessary component of the legislation allowing for the possibility of settlement, supervised by the Department of Labor to prevent subversion, allowing for honest compromise of claims without costly litigation. *Id.* Though the *Walton* Court did not expressly hold that purely private settlements under the FLSA were prohibited, the Seventh Circuit's reasoning leads to the conclusion that it would have followed the lead of *Lynn's Food* if necessary to the decision. More recently, in *O'Connor* the Federal Circuit found that, in the private employment context, a purely private settlement of FLSA claims were prohibited. 308 F.3d at 1242. After examining *O'Neil* and *Gangi*, the Court in *O'Connor* noted that those cases "stand for the principle that a private sector employee cannot waive or release his right to back wage compensation and liquidated damages under the FLSA." The *O'Connor* Court cited *Lynn's Food* as an indication of the dangers involved in allowing private employees to enter into private, unsupervised settlements as to their FLSA rights. *Id.* at 1244. In coming to a resolution in the case, the Court distinguished the environment and law surrounding the private and public sector and found that this prohibition applicable to the private sector was not applicable to government employers. *Id.* at 1243—44.

In one other case interpreting this issue, the Sixth Circuit took a middle position. *Runyan v. Nat'l Cash Register Corp.*, 787 F.2d 1039 (6th Cir.1986). In *Runyan*, the Sixth Circuit, sitting en banc, held that a knowing and voluntary release was proper under the Age Discrimination in Employment Act ("ADEA"). 787 F.2d at 1044. The en banc Court reversed a panel decision that relied upon *O'Neil* and *Gangi* in holding that waivers were not proper under the ADEA, just as they were not proper under the FLSA. *See Runyan*, 787 F.2d at 1045 (Engel, J., dissenting). The en banc Court relied upon the fact that both *O'Neil* and *Gangi* specifically left open the question of whether compromise would be permissible involving a bona fide dispute as to liability to hold that the

ADEA would permit settlements and releases in such a situation. *Id.* at 1042—43. Because the enforcement provisions of the ADEA were based upon the same provisions in the FLSA, the Court in *Runyan* held that its reading of *O'Neil* and *Gangi* supported permitting a release under the ADEA. *Id.* at 1043. Additionally, the Court cited to the analysis in *Allegheny–Ludlum* as "support[ing] our narrow reading of *O'Neil* and *Gangi.*" *Id.* at 1044 n. 7. The Court refrained, however, from specifically stating that it viewed purely private compromises under the FLSA as permissible. The Court noted that the purposes behind the enactment of the ADEA and the FLSA were "obviously different" and that releases under the ADEA were "very different from cases concerning releases of FLSA claims by lay persons seeking payment of minimum wages, in amounts ascertainable by uncomplicated methods, usually with little knowledge of their legal rights." *Id.* at 1043, 1044. Further, the Court noted that "[i]t is not surprising that courts have found FLSA releases unenforceable given the nature of the factual issues they concern. In FLSA cases the factual issues concern the number of hours worked and the base pay rate—both of which are amenable to determination with some precision." *Id.* at 1044 n. 8. *Runyan* thus stands in a middle position between the Fifth Circuit's analysis in *Allegheny–Ludlum* and the Eleventh Circuit's analysis in *Lynn's Food.* While the analysis in *Runyan* supports a holding that a compromise of FLSA claims involving a bona fide dispute as to liability would not be prohibited, it also recognizes the dangers involved in such a holding.

In other contexts, treatment of the FLSA and related statutes since the Supreme Court's decisions in *O'Neil* and *Gangi,* and the amendments to the FLSA, has generally been in concert with the view expressed in *Allegheny–Ludlum* that "courts have declined in most instances to fashion comparable doctrine from whole cloth." *Allegheny–Ludlum,* 517 F.2d at 861. In *Barrentine v. Arkansas–Best Freight Sys., Inc.,* the Supreme Court held that the filing of FLSA claims in federal courts would not be barred even though the same claims had been submitted to mandatory arbitration pursuant to a collective bargaining agreement. 450 U.S. 728, 745, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). The Court in *Barrentine* emphasized that,

> [The] Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, [the Court has] held that FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate.

*Id.* at 1444—45 (citing *O'Neil,* 324 U.S. at 707, 65 S.Ct. 895; *Gangi,* 328 U.S. at 114—16, 66 S.Ct. 925; *Walling,* 330 U.S. at 152, 67 S.Ct. 639; *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572, 577, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942)). The rationale behind this holding, that a union might decide not to support the claim vigorously in arbitration and that arbitrators may be less familiar with the public law considerations underlying the FLSA than federal courts, has largely been discounted by subsequent Supreme Court decisions, however. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 27, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (finding the Federal Arbitration Act compatible with the ADEA and noting that the distrust of arbitrators, inherent in the *Barrentine* decision, had largely been undermined by subsequent decisions). In fact, recent court decisions have held that FLSA claims subject to an arbitral decision are enforceable. *See, e.g., Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 506 (4th Cir.

2002); *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319—20 (9th Cir.1996); *Carter v. Countrywide Credit Indus., Inc.*, 189 F.Supp.2d 606, 609—14 (N.D.Tex.2002). Likewise, claims as to other statutory labor rights have generally been held waivable. For example, in *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1091 (5th Cir.1987), and *Runyan*, the Fifth and Sixth Circuits, respectively, held that knowing and voluntary releases were not prohibited under the enforcement provisions of the ADEA, which are dependent upon the enforcement provisions of the FLSA.[22] In 1990, Congress ratified this practice with the Older Workers Benefit Protection Act. Pub.L. No. 101–433, § 201, 104 Stat. 978, 983 (1990) (amending 29 U.S.C. § 626(f)(1)). Rights under the Title VII discrimination laws have similarly been held waivable under a knowing and voluntary standard. *Allegheny–Ludlum*, 517 F.2d at 856—62; *see also Smith v. Amedisys, Inc.*, 298 F.3d 434, 441 (5th Cir.2002). The move away from the rigid interpretation of statutory rights of the 1940s to a regime which supports settlement as a favored means of resolving disputes, *Thomas v. Louisiana*, 534 F.2d 613, 615 (5th Cir.1976) (citation omitted), supports the holding that a compromise and release of FLSA rights involving a bona fide dispute as to liability, such as the amount of hours worked or compensation due, is not prohibited.

The Court in *Allegheny–Ludlum* put forward the rationale underlying this analysis in discussing releases of Title VII statutory rights.

> Very frankly, we cannot conceive of how any employment discrimination dispute could ever be resolved outside, or indeed inside, the courtroom, if defendants were forbidden to obtain binding, negotiated settlements. No defendant would ever deliver money, promises, or any other consideration, not even a peppercorn, except after entry of a contested, final court order.... The EEOC and judicial caseloads would swell to chaotic dimensions. Industrial peace would be needlessly threatened.

*Allegheny–Ludlum*, 517 F.2d at 858–59. The same rationale supports extending the availability of purely private compromises and releases to the FLSA context. Judicial caseloads, as well as the workload of the Wage and Hour Administration, would likely be swamped with unnecessary disputes, many dubious and with little evidence, that could not be finally settled without approval from either a court or the Secretary of Labor. This surely cannot be what was intended by Congress when the FLSA was passed. In fact, less than ten years after the passage of the FLSA, Con-

---

**22.** The treatment of releases under the ADEA by the EEOC gives some extra support to the thought that similar releases under the FLSA are permissible where there exists a bona fide dispute as to liability. In 1987 a rule was proposed by the EEOC that would have allowed knowing and voluntary releases of rights under the ADEA. The EEOC took the view in proposing its rule that such settlements and releases likely would be permissible under the current law interpreting the FLSA, but that it wanted to ensure permissibility in Circuits that had read the FLSA enforcement provisions contrary to this rule. *See* 52 Fed.Reg. 32293, 32295 (Aug. 27, 1987) (citing *Runyan* and *Lynn's Food*). Congress did suspend the implementation of the rule for one year, 133 Cong. Rec. S14383–84 (Oct. 15, 1987); 133 Cong. Rec. 2401, 12534 (Dec. 21, 1987), concerned that it was "without legal foundation and contrary to public policy." 135 Cong. Rec. E816 (1989) (statement of Rep. Hawkins). The suspension was renewed a year later as Congress held hearings on the issue. 134 Cong. Rec. S10022 (July 27, 1988); 134 Cong. Rec. H8399 (Sept. 27, 1988). Congress eventually upheld the availability of such releases with the passage of the Older Workers Benefit Protection Act in 1990. Pub.L. No. 101–433, § 201, 104 Stat. 978, 983 (1990).

gress amended the statute to provide for compromises of then-existing claims involving bona fide disputes. Though Congress could have made the express availability of such compromises prospective, rather than purely retrospective, it did not prohibit such compromises. Congress left this decision to "determination under other law." Portal–to–Portal Act of 1947, H.R. Cong. Rep. No. 326, 80th Cong., 1st Sess. 12 (1947).

■ "Congress has not closed the doors to the settlement of disputed questions of the [FLSA] and the Courts should not do so by judicial construction." *Atlantic Co. v. Broughton*, 146 F.2d 480, 485 (5th Cir.1944) (Waller, J., dissenting). "Interminable litigation, stimulated by a contingent reward to attorneys, is necessitated" by the failure to permit private compromises and releases of FLSA claims involving bona fide disputes as to liability. *Walling*, 330 U.S. at 155, 67 S.Ct. 639 (Jackson, J., concurring). No court other than the Eleventh Circuit has expressly held that such a settlement is prohibited. A fair reading of the Fifth Circuit's decision in *Allegheny–Ludlum* and the Sixth Circuit's en banc decision in *Runyan* supports the view that such compromises are permissible. Therefore, the Court holds that, according to the language of the FLSA, its amendment by the Portal–to–Portal Act of 1947 and the Fair Labor Standards Amendments of 1949, and its interpretation in the case law, parties may reach private compromises as to FLSA claims where there is a bona fide dispute as to the amount of hours worked or compensation due. A release of a party's rights under the FLSA is enforceable under such circumstances.

### 5. *Plaintiff's Claim*

According to the foregoing analysis, Plaintiff's claim for overtime benefits under the FLSA is dependent upon whether there was a bona fide dispute as to the amount of hours worked or compensation due at the time the parties entered into the compromise and release at issue. On June 2, 2003, Plaintiff signed a document that Defendants have put forward as a release of Plaintiff's FLSA claims. As noted above, this document encompassed two sentences: "I Robert D. Martinez on this 2nd day of June 2003, accept $1000.00 in full payment for all overtime accumulated and unpaid during the period from 06/01/01 to 06/01/03. I consider this amount as full settlement for all overtime in question and reported." According to each party, this release came about when Plaintiff began to complain that he had not been paid for overtime work. Neither party has come forward with conclusive evidence as to whether Plaintiff was previously paid earned overtime compensation. Plaintiff maintains in his statement that he was never paid overtime compensation, either at the agreed upon rate of $50 per Saturday or the statutory rate of time and one-half. Defendants have offered Plaintiff's time cards and an analysis of how many hours Plaintiff worked each week. According to Defendants, Plaintiff worked 45 hours and 18 minutes of overtime from December 1, 2001 to September 6, 2002, with a rate of pay during that time of $7.50 per hour. Defendants note that under this analysis Plaintiff would have been owed $509.06 in overtime compensation—nearly half the amount presented to Plaintiff on June 2, 2003. No records other than Plaintiff's time cards have been put forward as to Plaintiff's claims as to overtime compensation. Notably, no evidence other than the statements of Allen Shuler has ever been offered as to Plaintiff's actual rate of pay. Nor has any evidence ever been offered as to the amount actually paid to Plaintiff each pay period. Plaintiff continues to maintain that he was owed more than $3000 in overtime compensation and was never paid any of this compensation other than the $1000 on June 2, 2003.

The evidence in the record demonstrates, therefore, that there was a bona fide dispute as to liability at the time the parties entered into a compromise as to Plaintiff's overtime compensation.

 Because a bona fide dispute as to liability existed on June 2, 2003, a proper release signed by Plaintiff waiving his rights under the FLSA in exchange for the settlement payment would be valid and enforceable. The only remaining question is whether the document signed on June 2, 2003 constitutes a valid release waiving Plaintiff's FLSA rights. The document signed by Plaintiff contains no language directly addressing the FLSA or any other statutory rights thereunder. In other contexts, a release of statutory rights need not specifically address the statutory right. *Strozier v. General Motors Corp.*, 635 F.2d 424, 426 (5th Cir.1981) (noting as such in the Title VII context). Where "[t]he remedy sought and settled [is] the precise remedy sought" in the litigation, a release is treated as valid as to those statutory remedies. *Id.* Plaintiff received $1000 to settle his dispute as to unpaid overtime compensation. Plaintiff now seeks the remaining overtime compensation he says is owed. As in *Strozier*, "[t]he remedy sought and settled was the precise remedy sought in this lawsuit." *Id.* The June 2, 2003 document is therefore not invalid because of the failure to specifically address the FLSA or other rights under the statute.

Plaintiff finally argues that the June 2, 2003 document was a product of duress and therefore invalid. In *Strand v. Garden Valley Tel. Co.*, the only case cited by the Supreme Court in *Gangi* as addressing the issue of a compromise involving bona fide disputes as to liability, the district court stated that "[t]here must be a final meeting of the minds upon the compromise, with a full understanding of the dispute and the effect of the compromise" in order to act as a valid release of rights under the FLSA. 51 F.Supp. 898, 905 (D.Minn.1943). Plaintiff complains that his truck was unavailable and undergoing repairs on June 2, 2003, that he needed money to fix the truck, that his wife was terminally ill, and that Defendants knew of his situation at the time. Plaintiff asserts that this establishes he signed the release under duress. There is no evidence that the June 2, 2003 document was signed under duress. That Plaintiff needed money at the time he signed the document does not rise to the level of economic duress. *See Southern Travel Club, Inc. v. Carnival Air Lines, Inc.*, 986 F.2d 125, 129 (5th Cir.1993); *Lee v. Hunt*, 631 F.2d 1171, 1178 (5th Cir.1980) (discussing Texas law of duress). The June 2, 2003 document was therefore a valid release of Plaintiff's FLSA rights and is enforceable in this litigation. Defendants' are granted summary judgment as to Plaintiff's FLSA claim for overtime compensation.

### E. Intentional Infliction of Emotional Distress

 The Texas Supreme Court recently clarified the status of the tort of intentional infliction of emotional distress under Texas law. Intentional infliction of emotional distress is a "gap-filler" tort which has no application where "the actor intends to invade some other legally protected interest, even if emotional distress results." *Hoffmann–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 443 (Tex. 2004) (quotations omitted). Congress has provided for the specific types and amounts of damages, including emotional harm damages, that may be awarded to remedy discrimination. *See Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 937 (5th Cir.1996). The intentional infliction of emotional distress tort may not be used to circumvent this decision. *Hoffmann–La Roche*, 144 S.W.3d at 444. There is, therefore, no cause of action for intentional

infliction of emotional distress where the facts forming the basis for that claim also form the basis for another cause of action, such as a Title VII claim. In this case, the same facts forming the basis for Plaintiff's intentional infliction of emotional distress claim form the basis of Plaintiff's Title VII harassment claim. Accordingly, there is no claim for intentional infliction of emotional distress and judgment is entered for Defendants on that claim.

## F. Interlocutory Appeal

In a motion filed April 26, 2005, Plaintiff has asked this Court to enter final judgment as to the substantive FLSA claim and to certify the summary judgment order for interlocutory appeal. The February 28, 2005 Order and this Amended Order deal with a controlling question of law as to which there is a substantial ground for difference of opinion. 28 U.S.C. § 1292(b). The Court has ruled that settlements of FLSA claims may entered into between private parties without intervention or supervision of the Department of Labor or the courts, where there exists a bona fide dispute as liability, such as hours worked or compensation received. The Orders have detailed much of the history of the judicial interpretation of the FLSA, including the historical antipathy to private settlements by the courts, as well as the Portal-to-Portal Act of 1947 and the Fair Labor Standards Amendments Act of 1949, in ruling that such a private settlement was not barred by the FLSA. Whether private settlements of FLSA claims involving a bona fide dispute are permitted under the FLSA are clearly a controlling question of law as to Plaintiff's substantive FLSA claim. There certainly exists substantial ground for difference of opinion as the only Circuit Court of Appeals to directly rule on this issue has disagreed with the Court's Order. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir.1982) (holding FLSA claims may not be settled, including where there exists a bona fide dispute as to liability, without the approval of the Department of Labor or the courts). In addition, immediate appeal may materially advance the ultimate termination of the litigation, as Plaintiff remains scheduled for trial against the same defendant for his claims of retaliation under the FLSA and hostile work environment harassment. 28 U.S.C. § 1292(b). Accordingly, the Court hereby certifies this Amended Order for interlocutory appeal. *See Gray ex rel. Rudd v. Beverly Enters.-Mississippi, Inc.*, 390 F.3d 400 (5th Cir.2004); *Clark-Dietz & Assocs.-Eng'rs, Inc. v. Basic Const. Co.*, 702 F.2d 67, 68 (5th Cir.1983); *Rogers v. City of San Antonio, TX*, No. Civ.A.SA-99-CA-1110, 2003 WL 1571550 (W.D.Tex. Mar. 24, 2003). Plaintiff's motion (docket No. 54) is GRANTED. This case is hereby STAYED pending the outcome of Plaintiff's interlocutory appeal proceedings.

## IV. Conclusion

Plaintiff has alleged violations of the Thirteenth Amendment, 42 U.S.C. § 1981, Title VII, and the Fair Labor Standards Act, as well as a claim for intentional infliction of emotional distress. Plaintiff complains of discrimination and harassment on the basis of his race and national origin. Plaintiff also complains of retaliation in violation of both Title VII and the FLSA. There is no cause of action for employment discrimination under the Thirteenth Amendment. Similarly, there is no claim under the Texas tort of intentional infliction of emotional distress where there is a claim under Title VII. Additionally, there is no evidence of disparate treatment to support a discrimination claim. Further, the Court finds that a private compromise of claims under the FLSA is permissible where there exists a bona fide dispute as to liability. Accordingly, the Court finds that summary judgment should be GRANTED in favor of Defen-

**634**

dants on Plaintiff's Thirteenth Amendment, § 1981, Title VII discrimination, FLSA overtime payments, and intentional infliction of emotion distress claims.

There are, however, genuine issues of material fact as to Plaintiff's Title VII harassment claim based on evidence of a hostile work environment. There is also evidence of retaliation against Plaintiff for the exercise of his rights under the FLSA. The Court therefore DENIES summary judgment on Plaintiff's Title VII harassment claim and Plaintiff's FLSA retaliation claim.

In sum, Defendants' motion for summary judgment (docket no. 33) is GRANTED in part and DENIED in part. Plaintiff's motion to amend the summary judgment to certify it for interlocutory appeal is GRANTED (docket no. 54) and this case is STAYED pending appeal proceedings.