Janelle **HOHNKE**, Plaintiff,

v.

The **UNITED STATES of America**, Defendant.

No. 04–497C.

United States Court of Federal Claims.

Dec. 20, 2005.

Tricia L. Knight, Knight & Associates, Milwaukee, Wisconsin, attorney of record for Plaintiff. With her on the briefs was Jordana E. Thomadsen, Knight & Associates. Brenda Lewison, Knight & Associates, argued.

Christian J. Moran, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for Defendant. With him on the briefs were David M. Cohen, Director, Mark M. Melnlck, Assistant Director, and Peter D. Keisler, Assistant Attorney General. Michael Newman, Assistant Regional Counsel, Department of Veterans Affairs, Milwaukee, Wisconsin, of counsel.

Sarah Leigh Martin, law clerk.

## *OPINION*

BASKIR, Judge.

The Plaintiff, Ms. Janelle Hohnke, seeks overtime wages allegedly due her under the Fair Labor Standards Act of 1938 ("FLSA" or "the Act"), 29 U.S.C. § 201 *et seq.* (2000), for the time she spent caring for her police canine, Ury, outside of her regular full-time duties as a canine police sergeant. The Defendant's Motion for Summary Judgment asserts that Ms. Hohnke waived her right to bring an FLSA overtime claim in a valid settlement agreement that meets the elements of an accord and satisfaction.

The issue before the Court is whether a federal employee, assisted by counsel but not represented by a union, is bound by a private settlement in which she waived any potential claim for overtime wages under the FLSA. **We conclude that she is not, and deny the Defendant's Motion for Summary Judgment.**

### *Background*

The following facts are not in dispute.

From August 2, 1998, to March 7, 2003, the Plaintiff, Ms. Janelle Hohnke, worked as a Police Services Canine Sergeant for the Department of Veterans Affairs Medical Center in Milwaukee, Wisconsin ("VAMC"). As part of her job during that time, Ms. Hohnke handled and cared for a police canine named Ury. In the instant action, Ms. Hohnke brings claims against the Defendant for the VAMC's failure to pay her overtime wages for time she allegedly spent caring for Ury outside of regular working hours. Her claims include time caring for and training Ury, as well as taking him to veterinary appointments.

On December 8, 2002, Ms. Hohnke was in a car accident while she was transporting Ury in her police canine vehicle. After investigation, the VAMC determined that the accident was Ms. Hohnke's fault. While the canine vehicle was being repaired, Ms. Hohnke was ordered to bring Ury to the

VAMC on or around January 16, 2003. The dog was then transferred to a kennel in Illinois. From the time of the accident, Ms. Hohnke stopped working as a canine officer, and instead worked as a police officer and supervisor for the VA.

In January of 2003, Ms. Hohnke filed an Equal Employment Opportunity ("EEO") complaint against her employer, alleging discrimination on the basis of gender. She made allegations regarding the discriminatory work environment, which she claimed culminated in the removal of Ury from her possession. Her EEO complaint did not involve a claim for wages.

On January 31, 2003, Ms. Hohnke filed a motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction to regain possession of Ury, claiming that she was the legal owner of the dog. The district court denied the TRO. It held that Ms. Hohnke had failed to establish irreparable harm, in part because the VA represented that Ury was healthy at the kennel. The court ordered the case dismissed unless Ms. Hohnke filed a complaint by February 28. Ms. Hohnke's motion for a TRO did not involve a claim for wages.

After the TRO denial, Ms. Hohnke and the Milwaukee VAMC, through their attorneys, began negotiating over ownership of Ury. Ms. Hohnke was not represented by a union in this or the above-described matters. She was informed by management that her position was not subject to a collective bargaining agreement.

The VA attorney drafted a settlement proposal that provided for the sale of Ury to Ms. Hohnke for $4,600, so long as she agreed to resign from her job and waive her right to file various civil actions against the VA. Specifically, the draft agreement would have required Ms. Hohnke to withdraw her EEO complaint and dismiss her TRO action. In addition, Ms. Hohnke would agree to:

    c.  Not file any further actions concerning her employment with the Agency... (including, but not limited to, union grievances, EEO Complaints, MSPB appeals, Unfair Labor Practice charges with the FLRA, or complaints to the U.S. Office of Special Counsel); [and]

    d.  Not file any complaints, actions or charges alleging that the Agency has improperly failed to pay her overtime during her employment with the Agency[.]

App. to Def. Motion at 49–50. Although the draft settlement agreement did not specifically mention the Fair Labor Standards Act, the parties agree that paragraph (d) purported to waive overtime claims under the Act.

The attorneys discussed the draft settlement agreement. They disagree on the tenor of that discussion, a dispute we delineate in more detail below. In any event, as a result of this conversation the VA counsel made several technical changes to the agreement. In particular, he deleted the overtime reference in paragraph (d) and added new language to paragraph (c). The final settlement agreement still required Ms. Hohnke to withdraw her EEO complaint, dismiss her TRO action, and resign or transfer to the U.S. Marshal's office. In addition, Ms. Hohnke agreed to:

    c.  Voluntarily waive and agree not to file any further actions (including, but not limited to, union grievances, EEO Complaints, MSPB appeals, Unfair Labor Practice charges with the FLRA, *overtime compensation claims [including FLSA claims]*, civil actions or complaints to the U.S. Office of Special Counsel) concerning her employment with the Agency based on facts in existence as of the date of this agreement...

App. to Def. Motion at 55 (brackets in original) (emphasis added). Of the potential claims listed in paragraph (c), Ms. Hohnke had filed only an EEO Complaint and a TRO Motion at the time the parties signed the agreement.

On March 7, 2003, the parties and their attorneys met to sign the final version of the settlement agreement. After they signed, Ury was brought into the room and given to Ms. Hohnke. As required by the agreement, Ms. Hohnke later paid $4,600 to the VA in three installments.

On July 21, 2003, Ms. Hohnke filed an FLSA overtime claim with the Office of Per-

sonnel Management ("OPM"). On the same day, Ms. Knight, Ms. Hohnke's attorney, sent a letter and a copy of the OPM claim to Mr. Newman, the VA attorney. Ms. Knight explained that she first realized that Ms. Hohnke had a potential overtime claim against the VAMC when she "recently" read an OPM decision regarding overtime wages for canine officers. This was the first notice the VAMC or its attorneys had of Ms. Hohnke's current overtime claim. For an unexplained reason, Ms. Hohnke filed an identical claim with OPM on or around December 12, 2003. OPM refrained from adjudicating her claim. She filed her FLSA claim with this Court on March 29, 2004.

### Standard of Review

We apply the well-known summary judgment standards in entertaining the Defendant's Motion. Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. U.S. Court of Federal Claims Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of *any* alleged factual dispute is not sufficient for a party to survive summary judgment—the dispute must be material to the legal issue. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. The Court must resolve all reasonable inferences in favor of the non-moving party. *Champagne v. United States*, 35 Fed.Cl. 198, 206 (1996).

The parties dispute the exchange between counsel during the settlement negotiations. The Defendant claims that the parties settled a bona fide dispute under the FLSA because Ms. Knight "threatened" to bring an FLSA claim during negotiations. Def. Brief at 5. Ms. Knight denies making such a threat. She says that she objected to the original paragraph (d) because it suggested the parties had given more attention to the subject of overtime than they in fact had. Ms. Knight advised Mr. Newman that in her view, FLSA claims could not be waived, and that the purported waiver was unenforceable. It is undisputed that at no time during negotiations did the parties discuss the merits or elements of a potential overtime claim.

Thus, their dispute over what was discussed is not material to whether the agreement was a valid settlement of an overtime claim.

### Discussion

■ We find that the settlement agreement was not a valid accord and satisfaction of Ms. Hohnke's potential overtime claims. We do so for two reasons. First, we conclude that FLSA claims cannot be waived prospectively, and to be enforceable, an FLSA settlement must resolve a bona fide dispute over hours worked or compensation due. Second, even assuming there was a bona fide dispute at the time the parties signed the agreement, there are only a limited number of ways in which overtime claims can be resolved, none of which occurred in this case. We address these points in turn in the following sections.

The stated purpose of the FLSA is to alleviate labor conditions that are detrimental to the "health, efficiency, and general well-being of workers." 29 U.S.C. § 202. Section 207(a) of the Act requires an employer to pay an employee one and one-half times her regular rate of pay for work in excess of 40 hours per week. *Id.* at § 207(a). An employer who violates this provision is liable for the unpaid wages, as well as an equal amount of liquidated damages, attorneys' fees, and costs. *Id.* at § 216(b). The court may also award "equitable relief as may be appropriate to effectuate the purposes" of the Act, including reinstatement and promotion. *Id.* An aggrieved employee may bring an action against her employer in any state or federal court of competent jurisdiction. *Id.*

This Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), over claims against the United States founded upon any "Act of Congress." Because the Tucker Act standing alone does not create a substantive right of recovery for money damages, a plaintiff must also demonstrate a separate, substantive right pursuant to a money-mandating provision. *See, e.g., United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

The FLSA is a money-mandating "Act of Congress" under the Tucker Act because it allows an aggrieved employee to bring a suit for damages against his or her "employer," which is defined in the FLSA by reference to include "the Government of the United States." *See El–Sheikh v. United States,* 177 F.3d 1321, 1323–24 (Fed.Cir.1999). Thus, the FLSA waives the United States' sovereign immunity and provides this Court with subject matter jurisdiction. *Id.*

## I. Prospective Waivers of FLSA Overtime Claims

### A. The Supreme Court's Early Decisions

■ In 1945 the U.S. Supreme Court first considered whether an employee could waive her right to wages or liquidated damages under the FLSA. *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). *Brooklyn Savings* involved two purported settlements, which the Court held did not involve bona fide disputes under the Act. *Id.* at 703, 713, 65 S.Ct. 895. In the first consolidated case, the employee accepted a check from his prior employer in exchange for a release of the employee's rights under the FLSA, without any prior discussion of the existence or amount of liability. *Id.* at 703 n. 12, 65 S.Ct. 895. In the second case, the employer similarly offered his employee a check in exchange for a release under the Act, even though both parties knew that a larger amount of money was due. *Id.* at 701–02, 65 S.Ct. 895. (A third joined case involved the question of interest on damages recovered under the Act. *Id.* at 714, 65 S.Ct. 895.) The Court decided that the first two transactions constituted attempted waivers of the employees' FLSA claims, not settlements of bona fide disputes over coverage or amount due. *Id.* at 703–04, 65 S.Ct. 895.

The question, then, in *Brooklyn Savings* was whether FLSA rights could be waived or settled in the absence of a bona fide dispute over entitlement. *Id.* at 704, 65 S.Ct. 895. The Court explained that whether a private right may be waived when it is contained in a statute intended to benefit the public interest depends upon whether waiver would thwart the legislative policy behind the law. *Id.* A court must therefore examine Congress' intent in enacting the statute. *Id.* at 705, 65 S.Ct. 895. The Court concluded that Congress did not intend to permit employees to waive their right to liquidated damages. *Id.* at 706, 65 S.Ct. 895. The purposes of the Act were:

> to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce.

*Id.* at 706–07, 65 S.Ct. 895 (internal footnotes omitted). The Court concluded, "No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act." *Id.* at 707, 65 S.Ct. 895. The same policies applied to waivers of liquidated damages, so the Court held that those also could not be waived. *Id.*

The Court's rationale was further supported by the goal of preventing competition between employers over wages by means of a uniform application of the Act. *Id.* at 710, 65 S.Ct. 895. The legislative history made it clear that "[t]here are to be no differentials either between sections of the United States, between industries, or between employers." *Id.* at 710 n. 25, 65 S.Ct. 895 (quoting H. Rep. No. 2182, 75th Cong., 3d Sess., at 6–7). To accomplish this goal, Congress made it clear that an "employer shall not employ a worker longer than the specified time without payment of overtime compensation" or back pay and liquidated damages. *Id.* at 711, 65 S.Ct. 895. In short, the provisions of the FLSA are "mandatory." *Id.* at 710, 65 S.Ct. 895.

*Brooklyn Savings* left open the question of whether an employee could waive her rights under the FLSA in settlement of a bona fide dispute between the parties with respect to coverage or amount. The Supreme Court

partially answered that question in *D A Schulte, Inc. v. Gangi,* 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1946). In *Schulte,* the Court considered the validity of a settlement between employer and employee of a dispute over the reach of the Act. Although the parties did not dispute how many overtime hours the employee worked, they disputed whether the employer was covered by the Act, *i.e.,* whether the employer was engaged in interstate commerce. *Id.* at 111, 66 S.Ct. 925. At a minimum, the Court held that the reasons it gave in *Brooklyn Savings* also barred a settlement of a bona fide dispute as to the Act's coverage. *Id.* at 115, 66 S.Ct. 925. The Court left open the question of whether settlements of bona fide disputes over hours worked or amount due can be valid.

Taking *Brooklyn Savings* and *Schulte* together, settlements of FLSA claims must resolve a bona fide dispute over something more than the Act's coverage. In other words, they must compromise a factual dispute over hours worked or compensation due. While the Supreme Court has not explicitly affirmed that a settlement agreement of a bona fide dispute over hours worked or compensation due is valid, the Supreme Court's reasoning in *Brooklyn Savings* and *Schulte,* 60 years of practice, and the FLSA amendments of 1949 all lead to the conclusion that settlements of bona fide disputes over hours worked or compensation due are enforceable under some circumstances. We discuss those circumstances below.

**B. The "Bona Fide Dispute" Requirement**

██ The parties cite no case holding that there can be a settlement of an FLSA claim other than of a bona fide dispute over hours worked or compensation due, and we are not aware of any. Nor are we aware of any case in which an employee's prospective waiver of a potential FLSA claim has been upheld. *See Brooklyn Savings,* 324 U.S. at 704, 65 S.Ct. 895 (prospective waivers in the absence of a bona fide dispute are ineffective). The very difference between a prospective waiver, which is prohibited under *Brooklyn Savings,* and a settlement, which may be valid

under some circumstances, is the existence of a bona fide dispute. *See Bull v. United States,* 65 Fed.Cl. 407, 411–12 (2005) (discussing the difference between prospective waivers and settlements under the FLSA).

The reason an agreement must settle a bona fide dispute over hours or compensation to be enforceable relates to the uniqueness of the FLSA and its purposes. If there is no bona fide dispute over hours worked or compensation due, then the employer *must* pay the employee for her labor. *See Schulte,* 328 U.S. at 116, 66 S.Ct. 925 ("[N]either wages nor the damages for withholding them are capable of reduction by compromise of controversies over coverage."). This is true because the terms of the FLSA are "mandatory." *Brooklyn Savings,* 324 U.S. at 710, 65 S.Ct. 895. To hold otherwise would allow an employer to contract with its employees to pay sub-minimum wages or avoid paying any overtime wages, both of which would be in direct violation of the Act. *See Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 306 (7th Cir.1986).

Unlike damages under many other laws, damages for FLSA violations are typically quite easy to calculate once the parties agree upon the number of overtime hours actually worked, so there is less ambiguity about how much an employer must pay. *See Runyan v. Nat'l Cash Register Corp.,* 787 F.2d 1039, 1044 n. 8 (6th Cir.1986), *superseded by statute,* Older Workers Benefit Protection Act of 1990, 29 U.S.C. § 626(f), Pub.L. No. 101–433, 104 Stat. 978. *Walton,* which put it persuasively, albeit in dicta, stated:

> Yet the Fair Labor Standards Act is designed to prevent consenting adults from transacting about minimum wages and overtime pay. Once the Act makes it impossible to agree on the amount of pay, it is necessary to ban private settlements of disputes about pay. Otherwise the parties' ability to settle disputes would allow them to establish sub-minimum wages.

*Walton,* 786 F.2d at 306.

For a bona fide dispute to exist, there must be some claim on behalf of the employee that she is entitled to overtime payment. And to settle such a bona fide dispute, there must be some resolution of the number of

hours worked or amount of money due. A bona fide dispute is not compromised when an employer simply pays an employee a lump sum of money in exchange for a promise not to bring a suit for overtime wages in the future. *Brooklyn Savings,* 324 U.S. at 703–04, 65 S.Ct. 895.

For example, as early as *Strand v. Garden Valley Tel. Co.,* 51 F.Supp. 898 (D.Minn. 1943), the court invalidated a compromise of an employee's wage claim for a certain sum of money. The court held that for such a compromise to be binding on the employee, it would have to be:

> clear-cut and definite. There must be a final meeting of the minds upon the compromise, with a full understanding of the dispute and the effect of the compromise. The settlement must be as to *the number of hours worked and thereafter must flow the full benefits as provided for by the Act, based on such hours.*

*Id.* at 905 (emphasis added), *cited in Schulte,* 328 U.S. at 115 n. 10, 66 S.Ct. 925.

Similarly, in *O'Connor v. United States,* 308 F.3d 1233, 1240–41 (Fed.Cir.2002), the Federal Circuit held that the parties settled a bona fide FLSA dispute. The settlement agreement in question was a response to union grievances filed against the employer agency on behalf of several employees. *Id.* at 1237. The agreement provided that the agency must pay a lump sum of money to the union, which would distribute the money to all of the employees pursuant to specific "tabulations in three appendices to the agreement" that represented the backpay and other damages the parties agreed was owed to each employee. *Id.* at 1237–38. (We will discuss *O'Connor* below in connection with *Brooklyn Savings* and *Schulte,* and as respects federal employees' settlement of bona fide FLSA disputes.)

As recently as this year, a court held that a bona fide dispute existed "as to the amount of hours worked or compensation due." *Martinez v. Bohls,* 361 F.Supp.2d 608, 631 (W.D.Tex.2005). The court upheld the settlement, which occurred as the result of the employee's complaints that he had not been paid overtime. *Id.* The employee accepted the payment as compensation for the over-time hours he worked during a two-year period, which was specified in the agreement. *Id.* In these cases, the courts analyzed how many overtime hours the employees worked and how much compensation was due, based on the allegations of both parties, to determine whether they settled a bona fide dispute.

No matter which version of the pre-agreement exchanges between counsel one accepts, it is clear that Ms. Hohnke and her employer did not resolve a bona fide FLSA dispute in the settlement agreement. Ms. Hohnke had not presented her employer with an overtime claim, and the VAMC had not objected to one. During settlement negotiations, the parties did not discuss how many overtime hours Ms. Hohnke worked, or how much compensation she was entitled to for such work. Much like the employees in *Brooklyn Savings,* Ms. Hohnke exchanged her right to purchase the dog for a waiver of whatever future overtime claims she might bring. A possible overtime claim was listed in a boilerplate paragraph along with other potential claims she was waving in advance.

The first time Ms. Hohnke asserted her right to overtime wages for her off-duty care of Ury was when her attorney filed a claim on July 21, 2003. She forwarded a copy to the VA attorney by letter. The letter asserted that Ms. Hohnke's attorney had only recently read an OPM decision holding that such activity constituted overtime under the FLSA. The parties cannot be said to have settled a bona fide dispute before that time, when the Plaintiff apparently did not even know one existed.

There is simply no support for the Defendant's argument that the bona fide dispute requirement should be equated to a knowing and intelligent waiver of the employee's rights under the Act. *See* Reply Brief at 3; Tr. at 29. The Defendant reasons that the advice of counsel ensures that Ms. Hohnke made such a knowing and intelligent waiver, thus settling a bona fide FLSA dispute. However, the law is clear that an employee cannot contract away her rights under the FLSA, regardless of her level of knowledge. *See Brooklyn Savings,* 324 U.S. at 706, 65

S.Ct. 895 (the FLSA was intended to "prevent private contracts" allowing violations of the Act). That Ms. Hohnke had an attorney to advise her of her rights does not convert this purported waiver into a valid settlement of a bona fide dispute of overtime compensation. It would thwart the legislative policies of the Act to allow such a transaction to deprive Ms. Hohnke of her Congressionally mandated right to overtime compensation for work she actually performed.

## C. Continuing Force of *Brooklyn Savings* and *Schulte*

*Brooklyn Savings* and *Schulte* continue to be binding on this Court, despite Defendant's argument that courts have departed from their "more dated statements." Def. Brief at 11. Defendant cites two cases for the proposition that the law has "evolved" to allow waivers of FLSA claims in accordance with the trend toward permitting individuals to waive employment rights—*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), and *O'Connor v. United States*, 308 F.3d 1233 (Fed.Cir. 2002). The Supreme Court, however, has already addressed and rejected Defendant's argument as respects FLSA claims. In *Schulte*, the Court held that employees cannot bargain away their right to liquidated damages through settlements of disputes over coverage. It rejected the respondent's argument that prohibiting private settlements of FLSA disputes would be a "sharp departure from the traditional policy of encouraging the adjustment instead of the litigation of disputes." 328 U.S. at 113, 66 S.Ct. 925 (citing enforceable settlements under the Federal Employers' Liability Act as an example of that policy). Defendant's argument is no more persuasive today.

Moreover, the two cases cited by the Government do not support its proposition. In *O'Connor*, the Federal Circuit held that federal employees settled their pending FLSA claims through an accord and satisfaction as bargained for by the employees' union. 308 F.3d at 1241. The Federal Circuit did not disapprove of *Brooklyn Savings* or *Schulte* as outdated law, as the Defendant claims, but recognized the continuing force of their rulings. However, the court acknowledged that the principles in *Brooklyn Savings* and *Schulte* applied differently to the federal employees in *O'Connor*, who, unlike the employees in those two cases, were governed by a collective bargaining agreement ("CBA") and covered by the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 7101 *et seq.* (2000). *Id.* at 1242. The court stated:

> *Brooklyn Savings* and *Schulte* therefore stand for the principle that a private sector employee cannot waive or release his right to back wage compensation and liquidated damages under the FLSA. They are inapposite to the instant case, however, which presents the question of whether a federal employee *who, pursuant to the CSRA, is represented exclusively by a union and subject to a CBA,* may legitimately relinquish his or her FLSA rights as part of an accord and satisfaction.

*Id.* (emphasis added). As will be discussed below, the different application of the rules of *Brooklyn Savings* and *Schulte* in *O'Connor* does not apply to Ms. Hohnke's case.

*Gilmer*, the other case cited by Defendant, is simply irrelevant to the current case. In *Gilmer*, the Supreme Court allowed waiver of a discrimination claim under the Age Discrimination in Employment Act ("ADEA") in favor of arbitration. 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26. *Gilmer* did not involve a waiver of an FLSA claim. *Gilmer* made no reference to *Brooklyn Savings* or the FLSA, and specifically rejected the argument that concerns over unequal bargaining power compelled a finding that waivers under the ADEA are invalid. *Id.* at 33, 111 S.Ct. 1647. By contrast, *Brooklyn Savings* specifically rested its holding on the policies behind the FLSA, especially that of countering unequal bargaining power. 324 U.S. at 705–06, 65 S.Ct. 895.

The legislative polices behind FLSA and ADEA are different. *See Runyan*, 787 F.2d at 1043–44 (noting that the purposes behind the FLSA and ADEA are "obviously different," and that releases under the ADEA are "very different from cases concerning releases of FLSA claims by lay persons"). *Brooklyn Savings* itself acknowledged the dependence of its holding on the legislative history

of the FLSA, and not of any other law. 324 U.S. at 713, 65 S.Ct. 895 ("The decision in the instant case is based on the legislative policy behind this enactment[,] and issues arising under other acts having different legislative backgrounds are not conclusive in determining the legislative intent with respect to the [FLSA]."). Citing a case interpreting a different statute, with different policies and legislative history, does not further the Defendant's position.

Defendant claims that *O'Connor* "interpreted *Gilmore* [sic] in the context of a settlement of an FLSA claim by a union of Federal employees," Def. Brief at 11, implying that the *O'Connor* court specifically compared *Gilmer* to an FLSA-waiver situation. The Defendant's statement is curious, however, given that neither *Gilmer* nor the ADEA is even mentioned in the *O'Connor* opinion. Despite Defendant's statement to the contrary, it cites no authority for the argument that *Gilmer's* interpretation of the ADEA represents a departure from the Supreme Court's holding in *Brooklyn Savings*.

Rather than departing from *Brooklyn Savings* as outdated, the Supreme Court has specifically cited it favorably in more recent cases. For example, in *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 740, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), the Court cited *Brooklyn Savings* with approval. It stated:

> This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that *FLSA rights cannot be abridged by contract or otherwise waived* because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate.

*Id.* (emphasis added) (quoting *Brooklyn Savings*, 324 U.S. at 707, 65 S.Ct. 895). Defendant's claim that this Court should ignore the holding in *Brooklyn Savings* in favor of more current law is without merit.

The passage of time does not itself render a Supreme Court opinion invalid. Unless and until the Court overrules its prior decisions, this Court is not free to ignore them.

*Brooklyn Savings* and *Schulte* specifically interpreted the legislative policies behind the FLSA, and rested their holdings on that interpretation. *Brooklyn Savings*, 324 U.S. at 705–07, 65 S.Ct. 895; *Schulte*, 328 U.S. at 115, 66 S.Ct. 925. Changes in public policy regarding out-of-court settlements, changes in the opinions of lower courts, and changes with regard to other laws simply do not degrade the Supreme Court's specific interpretation of what Congress intended in 1938 with the passage of the FLSA. As the Supreme Court has very recently said about the FLSA, "Considerations of *stare decisis* are particularly forceful in the area of statutory construction, especially when a unanimous interpretation of a statute has been accepted as settled law for several decades." *IBP, Inc. v. Alvarez*, —— U.S. ——, ——, 126 S.Ct. 514, 523, 163 L.Ed.2d 288 (Nov. 8, 2005). To change its interpretation would require the Supreme Court to admit that it erred 60 years ago in describing the legislative purposes of the Act.

## II. Enforceable Settlements of Bona Fide Disputes

### A. Settlements Supervised by a Court or the Secretary of Labor

Even if we assume a bona fide overtime dispute existed at the time the settlement was signed, the waiver would still be unenforceable. An employee may settle a bona fide dispute only in limited circumstances, two of which are referred to in the current version of the statute. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352 (11th Cir.1982). In the 1949 FLSA amendments, Congress responded to concerns that employers could not settle FLSA claims without pursuing litigation. *See Martinez*, 361 F.Supp.2d at 622 (tracing the history of the Act). The amendments added section 216(c), which allows an employee to accept an out-of-court payment for unpaid wages if it is supervised by the Secretary of Labor. 29 U.S.C. § 216(c); *Lynn's Food Stores*, 679 F.2d at 1353. Such an acceptance prohibits the employee from later bringing a claim against the employer for those unpaid wages. Section 216(c); 679

F.2d at 1353. Defendant's argument that an employer must clog the courts in order to settle FLSA claims ignores the fact that Congress already addressed the argument almost sixty years ago by creating an alternative to litigation.

The second way an employee may settle her claim for back wages occurs if she actually brings a lawsuit against her employer under section 216(b), enters into a settlement agreement with the employer, and the district court enters a stipulated judgment "after scrutinizing the settlement for fairness." *Lynn's Food Stores,* 679 F.2d at 1353. In so holding, the court in *Lynn's Food Stores* reaffirmed the policies discussed in *Brooklyn Savings* and held that the private employees could not waive their FLSA rights, even in settlement of a bona fide dispute, except under the above-described two circumstances. *Id.* at 1354. The court rejected the argument that private settlement negotiations essentially duplicated the adversarial context of a lawsuit. Only submitting a settlement to a court for approval ensures its fairness:

> [T]o approve an "agreement" between an employer and employees outside of the adversarial context of a lawsuit brought by the employees would be in clear derogation of the letter and spirit of the FLSA.

*Id.* (citing *Brooklyn Savings,* 324 U.S. 697, 65 S.Ct. 895).

Neither Ms. Hohnke nor the United States claims that the settlement agreement in this case falls under either of the two exceptions discussed in *Lynn's Food Stores.* Rather, the settlement agreement between Ms. Hohnke and her employer was a purely private agreement. It was not accomplished in one of the legally enforceable ways that an employee may settle a FLSA claim against her employer.

## B. Settlements Negotiated Pursuant to the Civil Service Reform Act

The FLSA applies to federal employment as well as private employment. *See El–Sheikh,* 177 F.3d at 1323–24. However, the special circumstances attending federal employment mean that the rules applicable to private overtime claims do not necessarily

apply in the same way. *See O'Connor,* 308 F.3d at 1242–43. The Federal Circuit has recognized a third avenue by which a settlement of overtime claims under the FLSA may be enforced—when it is negotiated by a union pursuant to a collective bargaining agreement under the Civil Service Reform Act ("CSRA") grievance procedures. *Id.* at 1244.

In *O'Connor,* the Federal Circuit upheld a settlement agreement, bargained for by the federal employees' union through the administrative grievance procedures of the CSRA, as a valid accord and satisfaction of the employees' FLSA overtime claims. *Id.* The court noted that the Supreme Court in *Brooklyn Savings* had rested its holding on the purposes behind the Act—among them, to protect individual employees from the unequal bargaining power between themselves and their employers. *Id.* at 1242. Because the same concerns over unequal bargaining power are not present when federal employees have the protections of the CSRA, including union representation pursuant to a collective bargaining agreement, the *Brooklyn Savings* line of cases is not necessarily controlling. *Id.* at 1242–43. The *O'Connor* court specifically distinguished the plaintiffs' factual scenario from those in *Brooklyn Savings* and *Schulte:*

> [N]either *Brooklyn Savings* nor *Schulte* involved the CSRA or any other similar comprehensive statute addressing labor-management relations. Indeed, both cases explicitly anchored their holdings in what the Court perceived as the congressional intent behind the FLSA, namely to protect private employees from the harmful effects of unequal bargaining power. Such inequality is not a factor here, because *it was precisely this disparity in bargaining power that Congress sought to rectify through passage of the CSRA.*
>
> ... [T]he policy concerns driving the court's decision in *Lynn's Food Stores* are not present in the context of a settlement agreement *negotiated pursuant to the CSRA and a CBA.* To the contrary, the CSRA encourages employees to participate in labor unions in order to avoid exactly

the sort of unjust arrangements experienced by Lynn's Food's employees...

*Id.* at 1243–44 (emphasis added) (internal citations omitted) (citing the CSRA's purposes of protecting employees' rights to organize, bargain collectively, and participate in labor organization). The distinguishing factor in *O'Connor* was that the employees had the benefits of the CSRA—a union representative, a CBA, and specific statutory grievance procedures—to protect their rights. *Id.* at 1241–43.

Ms. Hohnke's situation is in no way comparable to that of the employees in *O'Connor.* She was not represented by a union operating pursuant to a CBA, and was not subject to the CSRA or "any other similar comprehensive statute addressing labor-management relations." *See id.* at 1243. As a consequence, Ms. Hohnke's position was no different from that of an unrepresented private employee. Although FLSA cases involving private-sector employees do not necessarily apply in the federal context, we share the views of Judge Lettow of this Court:

> In effect, [when a federal employee's union fails to pursue a grievance on behalf of the employee], the federal-sector employee is placed on the same footing as a private employee. *That private-sector caselaw is not controlling in the federal-sector context does not diminish its use as persuasive, confirmatory authority where the nature of a federal employee's situation parallels that of a private employee.*

*Mudge v. United States,* 59 Fed.Cl. 527, 534 (2004) (emphasis added); *accord Curtis v. United States,* 59 Fed.Cl. 543, 549 (2004).

The Defendant urges this Court to extend *O'Connor* to the present situation. *See* Tr. at 36, 40–41. It argues that representation by an attorney is the functional equivalent of representation by a union. In doing so, the Defendant asserts that the presence of counsel ensures that any FLSA waiver will be knowing and intelligent. That may be so. But the moving force behind FLSA jurisprudence is not simply that settlements must be knowing and intelligent. Rather, it is a recognition of the unequal bargaining power between individual employees and their employers. The presence of counsel does not redress that imbalance. If it did, the history of unionism in the United States would have been quite different.

In sum, the settlement agreement in the instant case was not bargained for pursuant to the CSRA, a CBA, or union grievance procedures. It does not fall under the *O'Connor* rule for settlements of federal FLSA claims.

### Conclusion

Ms. Hohnke did not legally waive her right to overtime compensation under the Fair Labor Standards Act. Nor did she settle her overtime claims through an accord and satisfaction. The settlement agreement resolved a dispute over Ms. Hohnke's dog, not a bona fide dispute over hours worked or overtime compensation due. It was not supervised by the Secretary of Labor, approved by a court, or bargained for by a union pursuant to grievance procedures of the Civil Service Reform Act.

**Accordingly, the Defendant's Motion for Summary Judgment is DENIED. The parties are ordered to submit a Joint Status Report no later than January 23, 2006, proposing a schedule for further proceedings in this case, including discovery.**

IT IS SO ORDERED.